Sheri Pan (SBN 316136)
sheri@zwillgen.com
ZWILLGEN LAW LLP
369 Pine Street, Suite 506
San Francisco, CA 94104
Telephone: (415) 590-2335
Facsimile: (415) 636-5965

*Attorneys for Defendant*
*iHeartMedia, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TREVOR HARRIS, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IHEARTMEDIA, INC.,<br><br>Defendant. | Case No.: 5:25-cv-06038-EKL<br><br>**DEFENDANT IHEARTMEDIA, INC.'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO TRANSFER, COMPEL ARBITRATION, OR DISMISS THE CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Eumi K. Lee<br>Hearing Date: December 17, 2025<br>Time: 10:00 a.m.<br>Courtroom: 7, 4th Floor<br><br>Opposition due: November 7, 2025<br>Reply due: November 24, 2025 |

**TO THE COURT AND ALL PARTIES OF RECORD:**

**PLEASE TAKE NOTICE THAT** on December 17, 2025, or as soon thereafter as the matter may be heard, before the Honorable Eumi K. Lee in Courtroom 7 of this Court, located on the 4th Floor of the San Jose Courthouse, 280 South First Street, San Jose, CA 95113, Defendant iHeartMedia, Inc. ("Defendant" or "iHeart") will, and hereby does move the Court for an order granting its Motion to Transfer, Compel Arbitration, or Dismiss the Class Action Complaint.

Jeffrey Landis, one of counsel for Defendant, certifies that he met and conferred with Counsel for Plaintiff on October 3, 2025 pursuant to Section VIII.A. of the Court's Standing Order for Civil Cases to discuss the bases for this Motion. Counsel for Plaintiff stated that he did not consent, thus necessitating this Motion.

Defendant's motion to transfer is based on 28 U.S.C. § 1404(a) on the grounds that Plaintiff agreed to a venue provision in iHeart's 2025 terms of use, which requires that this dispute be brought in the United States District Court for the Southern District of New York. Defendant's alternative motion to compel arbitration is based on the Federal Arbitration Act and Plaintiff's agreement to arbitrate this dispute pursuant to the terms he initially agreed to when creating his iHeart account in 2024. Defendant's alternative motion to dismiss is based on Federal Rule of Civil Procedure 12(b)(1) on the grounds that Plaintiff lacks standing, and Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiff's allegations fail to state any valid claim. This Motion will be based upon this Notice; the accompanying Memorandum of Points and Authorities; the Declaration of Rob Rowe; the complete record in this action; and such other matters and arguments as may come before the Court, including those raised in connection with reply briefing and oral argument relating to this Motion.

Dated: October 10, 2025

ZWILLGEN LAW LLP

By: */s/ Sheri Pan*
Sheri Pan (SBN 316136)
sheri@zwillgen.com

*Attorneys for Defendant*
*iHeartMedia, Inc.*

**TABLE OF CONTENTS**


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

- A. Plaintiff's Agreement with iHeart. ........ 3
- B. Plaintiff's Allegations Regarding iHeart and its Website. ........ 4
- C. Plaintiff's Alleged Experiences & Claim. ........ 5

III. ARGUMENT ........ 5

- A. This Matter Should be Transferred to the Southern District of New York Pursuant to the 2025 Terms. ........ 5
  - 1. Plaintiff's agreement with iHeart includes a forum selection clause. ........ 6
    - *a. Plaintiff agreed to the 2024 Terms when creating an iHeart account.* ........ *6*
    - *b. Plaintiff agreed to the 2025 Terms* ........ *9*
  - 2. The 2025 Terms' forum selection clause applies to this dispute. ........ 9
  - 3. The forum selection clause is enforceable. ........ 10
- B. If the Case Is Not Transferred, Plaintiff Should be Compelled to Arbitration Pursuant to the 2024 Terms. ........ 11
- C. If the Court Does Not Transfer the Case or Compel Arbitration, Plaintiff's Claim Must Be Dismissed. ........ 12
  - 1. Plaintiff does not allege a concrete Article III injury. ........ 12
  - 2. Plaintiff Fails to Show that iHeart Employed a Pen Register. ........ 17
    - a. Pen registers collect *outgoing* dialing, routing, addressing, or signaling information—not the source of those communications ........ 18
    - b. Plaintiff does not allege an actionable CIPA injury. ........ 24

IV. CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Marine Constr. Co. v. U.S. Dist. Court*,
571 U.S. 49 (2013)....................5, 6

*Aviles v. Hitachi Vantara LLC*,
No. 24STCV19162 (Cal. Super. Ct. Aug. 28, 2025)....................21

*Aviles v. LiveRamp, Inc.*,
No. 24STCV19869, 2025 WL 487196 (Cal. Super. Ct. Jan. 28, 2025)....................19, 20, 21, 23

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022)....................6

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015)....................11, 12

*Carolus v. Nexstar Media Inc.*,
No. 24-CV-07790-VC, 2025 WL 1338193 (N.D. Cal. Apr. 9, 2025)....................15

*Casillas v. Transitions Optical, Inc.*,
No. 23STCV30742, 2024 WL 4873370 (Cal. Super. Ct. Sept. 9, 2024)....................25

*Cetacean Cmty. v. Bush*,
386 F.3d 1169 (9th Cir. 2004)....................12

*Cooper v. Slice Techs., Inc.*,
No. 17-CV-02340-LB, 2017 WL 4071373 (N.D. Cal. Sept. 14, 2017)....................11

*DeVries v. Experian Info. Sols., Inc.*,
No. 16-CV-02953-WHO, 2017 WL 733096 (N.D. Cal. Feb. 24, 2017)....................9

*Friddle v. Epstein*,
16 Cal. App. 4th 1649 (1993)....................25

*Gabrielli v. Insider, Inc.*,
No. 24-CV-01566 (ER), 2025 WL 522515 (S.D.N.Y. Feb. 18, 2025)....................16

*Garcia v. Diversified Foodservice Supply, LLC*,
No. 24STCV19784 (Cal. Super. Ct. June 24, 2025)....................22

*Garon v. Keleops USA, Inc.*,
No. 25-CV-02124-DMR, 2025 WL 2522374 (N.D. Cal. Sept. 2, 2025)....................22, 23

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023)....................23

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)....................24

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) ........ 15, 16

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002) ........ 11

*In re DoubleClick Inc. Priv. Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) ........ 1, 23, 24

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) ........ 24

*In re Michele D.*,
29 Cal. 4th 600 (2002) ........ 20

*In re Nickelodeon Consumer Priv. Litig.*,
No. 12–07829, 2014 WL 3012873 (D.N.J. July 2, 2014) ........ 24

*In re U.S. for Ords. (1) Authorizing Use of Pen Regs. & Trap & Trace Devices*,
515 F. Supp. 2d 325 (E.D.N.Y. 2007) ........ 18

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) ........ 8

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) ........ 14, 17

*Kishnani v. Royal Caribbean Cruises Ltd.*,
No. 25-CV-01473-NW, 2025 WL 1745726 (N.D. Cal. June 24, 2025) ........ 14, 15

*L.W.A. v. LinkedIn Corp.*,
No. 5:24-CV-08436-EJD, 2025 WL 2780788 (N.D. Cal. Sept. 30, 2025) ........ 8-9

*LaCross v. Knight Transp., Inc.*,
95 F. Supp. 3d 1199 (C.D. Cal. 2015) ........ 10

*Lewis v. Liberty Mut. Ins. Co.*,
953 F.3d 1160 (9th Cir. 2020) ........ 10, 11

*Licea v. Hickory Farms LLC*,
No. 23STCV26148, 2024 WL 1698147 (Cal. Super. Ct. Mar. 13, 2024) ........ 22

*Lightoller v. Jetblue Airways Corp.*,
No. 23-CV-00361-H-KSC, 2023 WL 3963823 (S.D. Cal. June 12, 2023) ........ 13

*Losson v. Union des Ass'ns Europeennes de Football*,
No. 23-cv-06500-JSC, 2024 WL 3406987 (N.D. Cal. July 11, 2024) ........ 10

*M/S Bremen v. Zapata Off-Shore Co.*,
407 U.S. 1 (1907) ........ 6, 11

*Matera v. Google Inc.*,
No. 15-CV-04062-LHK, 2016 WL 5339806 (N.D. Cal. Sept. 23, 2016) ................................9

*McCann v. Foster Wheeler LLC*,
48 Cal. 4th 68 (2010) ................................................................................................7

*Mirmalek v. Los Angeles Times Comunications LLC*,
No. 24-CV-01797-CRB, 2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) ...............................23

*Mitchener v. CuriousityStream, Inc.*,
No. 25-CV-01471-NW, 2025 WL 2272413 (N.D. Cal. Aug. 6, 2025) .................................15

*MySpace, Inc. v. The Globe.com, Inc.*,
No. CV 06-3391-RGK, 2007 WL 1686966 (C.D. Cal. Feb 27, 2007)....................................9

*Nail v. Lens.com, Inc.*,
No. 2:24-CV-02531-SB-E, 2024 WL 3723912 (C.D. Cal. June 20, 2024)...............................8

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005)....................................................................................................24

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ........................................................................................6

*Patrick v. Running Warehouse, LLC.*,
93 F.4th 468 (9th Cir. 2024) ..........................................................................................7

*Popa v. Microsoft Corp.*,
No. 24-14, 2025 WL 2448824 (9th Cir. Aug. 26, 2025) ........................................2, 13, 14, 17

*Quamina v. JustAnswer LLC*,
721 F. Supp. 3d 1026 (N.D. Cal. 2024)...........................................................................7

*Rainey v. A Place for Rover, Inc.*,
No. 2:22-CV-00403-RGK-E, 2022 WL 16942849 (C.D. Cal. July 18, 2022)..........................8

*Rainey v. A Place for Rover, Inc.*,
No. 22-cv-00403-RGK-E (C.D. Cal. June 10, 2022) ..........................................................7, 8

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) .................................................................................................25

*Rodriguez v. Fountain9, Inc.*,
No. 24STCV04504, 2024 WL 4905217 (Cal. Super. Ct. Nov. 21, 2024)...............................25

*Rodriguez v. Sparc Grp. LLC*,
No. 24STCV26946 (Cal. Super. Ct. July 9, 2025) ...........................................................22

*Rowen v. Soundview Commc'n, Inc.*,
No. 14-CV-5530-WHO, 2015 WL 899294 (N.D. Cal. Mar. 2, 2015) ...................................11

*Sanchez v. Cars.com, Inc.*,
No. 24STCV13201, 2025 WL 487194 (Cal. Super. Ct. Jan. 27, 2025) ....25

*Sellers v. JustAnswer LLC*,
289 Cal. Rptr. 3d 1 (2021) ....8

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) ....23

*Shansby v. Edrington, USA, Inc.*,
No. 22-CV-06907-JSC, 2023 WL 2456789 (N.D. Cal. Mar. 9, 2023) ....12

*Smidga v. Spirit Airlines, Inc.*,
No. 2:22-CV-1578-MJH, 2024 WL 1485853 (W.D. Pa. Apr. 5, 2024) ....15

*Smith v. Maryland*,
442 U.S. 735 (1979) ....18

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ....12, 13

*Stability Sols., LLC v. Medacta USA, Inc.*,
No. 22-CV-07412-LB, 2023 WL 350546 (N.D. Cal. Jan. 20, 2023) ....6

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....12, 13, 14

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) ....16, 18, 19, 20

*United States v. Giordano*,
416 U.S. 505 (1974) (Powell, J., concurring) ....18

*United States v. Hagood*,
No. CR–13–00393 RMW, 2014 WL 2918271 (N.D. Cal. June 26, 2014) ....17

*United States v. Heckenkamp*,
482 F.3d 1142 (9th Cir. 2007) ....16

*United States v. Rosenow*,
50 F.4th 715 (9th Cir. 2022) ....17

*United States v. Soybel*,
13 F.4th 584 (7th Cir. 2021) ....20

*United States v. Torres*,
908 F.2d 1417 (9th Cir. 1990) ....18

*Voicemail Club, Inc. v. Enhanced Servs. Billing, Inc.*,
No. C 12–02189 SI., 2012 WL 4837697 (N.D. Cal. Oct. 10, 2012) ....6

*Ward v. TheLadders.com, Inc.*,
3 F. Supp. 3d 151 (S.D.N.Y. 2014) ....................9

*Xu v. Reuters News & Media Inc.*,
No. 24 CIV. 2466 (PAE), 2025 WL 488501 (S.D.N.Y. Feb. 13, 2025)....................11, 15, 16, 17

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
901 F.3d 1081 (9th Cir. 2018) ....................10

**Statutes**

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ....................11

28 U.S.C. § 1404(a) ....................2, 5, 6, 11

Cal. Penal Code § 630.50(b) ....................19

Cal. Penal Code § 630.50(c) ....................19

Cal. Penal Code § 637.2 ....................*passim*

Cal. Penal Code § 638.50(b) ....................23

Cal. Penal Code § 638.50(c) ....................22

Cal. Penal Code § 638.51 ....................*passim*

Cal. Penal Code § 638.52 ....................18

Cal. Penal Code § 638.53 ....................18

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ....................17

# I. INTRODUCTION

Plaintiff Trevor Harris's ("Plaintiff") lengthy Complaint, (ECF No. 1)—a copycat of many others filed by his counsel over the last several months—waxes on for page after page about how device-related data collected from routine internet interactions can be used for "tracking," or creating "profiles" of website visitors to use for targeted advertising. Ultimately, however, the factual allegations underlying Plaintiff's California Penal Code § 638.51 claim, along with any possible "injury" he suffered, boil down to those described in the second paragraph: Plaintiff alleges that when he visited Defendant iHeartMedia, Inc.'s ("iHeart") website www.iheart.com ("Website"), iHeart and certain third-party vendors involved in serving ads on the Website received Plaintiff's internet protocol ("IP") address, as well as "Metadata" about the device he used. *Id.* The Complaint seeks to cast this occurrence as some newly discovered and nefarious practice, when in reality it has been a basic tenant of how the Internet operates for nearly a quarter century**.** *See, e.g.*, *In re DoubleClick Inc. Priv. Litig*., 154 F. Supp. 2d 497, 503 (S.D.N.Y. 2001) (describing how internet advertising provider DoubleClick places a cookie on users' devices which then "sends a communication to the DoubleClick server saying 'I am cookie # 0001, send me banner advertisements to fill the blank spaces in the [] Web page,'" in response to which DoubleClick "identifies the user's profile by the cookie identification number and runs a complex set of algorithms based, in part, on the user's profile, to determine which advertisements it will present to the user"). Nevertheless, Plaintiff asserts that this routine exchange of information constitutes an unlawful "pen register." He contends that he and every other person that visited the iHeart website from California are owed $5,000 in statutory damages pursuant to California Penal Code § 637.2.

This is not the first (nor the last) time that a plaintiff has attempted to monetize basic internet functions through a sprawling claim for class statutory damages. But while there are undeniably circumstances that warrant class litigation, this is not one of them. If it were, every website that used a third-party vendor to deliver content or provide a service in connection with operation of the website would be utilizing a "pen register." That cannot be. This Court should reject Plaintiff's shakedown of iHeart for multiple alternative reasons.

First, Plaintiff's case cannot proceed in the Northern District of California. Plaintiff agreed to and is bound by iHeart's terms of use, including those operative as of March 12, 2025. Those terms require that any disputes arising out of or relating to Plaintiff's use of or access to the site be brought in the Southern District of New York. Because this case relates to Plaintiff's use of the Website, transfer is appropriate here under 28 U.S.C. § 1404(a).

Second, if the Court does not transfer pursuant to iHeart's current terms, the case is subject to arbitration. When Plaintiff created an account in December 2024, the terms he agreed to included an arbitration clause. Thus, if the Court finds that Plaintiff is not bound by iHeart's current terms, arbitration must be compelled pursuant to the original terms of Plaintiff's agreement with iHeart.

Third, if the Court does not transfer or compel arbitration, the case should be dismissed because Plaintiff lacks Article III standing to sue. The Ninth Circuit has expressly rejected the notion that a plaintiff can sue in federal court based on a "free-roaming privacy right" that is wholly unconnected to the traditional "four discrete torts that protected specific kinds of privacy-related harms." *Popa v. Microsoft Corp.*, No. 24-14, 2025 WL 2448824, at *6 (9th Cir. Aug. 26, 2025). Here, while Plaintiff alleges that iHeart collected basic information about his device, he does not allege that collection harmed him in a way similar to the four traditional privacy torts. Merely alleging a statutory violation of CIPA does not constitute an injury in fact.

Fourth, even if the case belonged here and Plaintiff had standing to sue, Plaintiff does not allege conduct that violates Section 638.51. As Plaintiff explains, a "pen register" is a device or process used to capture "outgoing" communications from a device, like recording "the numbers of outgoing calls from a particular telephone line." (Compl. ¶ 19.) But Plaintiff does not allege any collection of "outgoing" communications from his browser, such as the IP addresses of each website he chose to visit. Instead, all he alleges is that information *about his device and browser*—i.e., the "source" of incoming communications to the Website—is collected by iHeart and its third-party partners. But by definition, pen registers do not collect the "source" of incoming communications to a single website.

Fifth, Plaintiff's failure to allege any privacy (or other) injury also shows that he lacks statutory standing to bring a claim under California Penal Code § 637.2. While some statutes might

give "any" plaintiff the right to sue for a statutory violation, Section 637.2 limits relief to individuals "injured by a violation of this chapter." For the same reasons that Plaintiff cannot demonstrate an Article III injury, he cannot demonstrate a statutory injury and, thus, cannot state a claim based on any "technical" violation of Section 638.51 (which did not occur in any event).

For all these reasons, Plaintiff's case cannot proceed.

## II. BACKGROUND

### A. Plaintiff's Agreement with iHeart.

Plaintiff created an account with iHeart on December 1, 2024. (Declaration of Rob Rowe ("Rowe Decl.") ¶¶ 3-4.) To do so, Plaintiff visited the iHeart Website log-in screen and clicked a "Sign up" hyperlink, which appeared next to the words "Don't have an account?" (Rowe Decl. ¶¶ 6-7; Exhibit A to Rowe Decl. ("Ex. A") at 1) On the next screen, Plaintiff clicked the "Google" button to "create a free account:"



(*Id.* ¶¶ 6-7; Ex. A at 2.) On that same page, standalone text with underlined hyperlinks read "By creating an account, you also agree to our Terms of Use and Privacy Policy." (*Id.*) The hyperlinked Terms of Use led directly to iHeart's then-operative terms (the "2024 Terms"). (*Id.* ¶¶ 6-7.) The 2024 Terms explained that if iHeart made changes to its terms of use, it would provide notice on the Website and that any user's continued use of the iHeart Website or services would constitute acceptance of those revised terms. (Exhibit B to Rowe Decl. ("Ex. B") § 2.)

iHeart updated its terms on March 12, 2025 (the "2025 Terms"). In doing so, it posted a notice on the Website that the terms were updated as of the date. (Rowe Decl. ¶ 9.) Plaintiff continued to use the iHeart Website after that date, including on April 10, 2025, when he visited the site, logged in, and viewed/accessed media on various pages, including pages that linked to the 2025 Terms. (*Id.* ¶ 10.) The 2025 Terms updated iHeart's dispute resolution provisions, including to remove the arbitration provision that was included in the 2024 Terms. (Exhibit C to Rowe Decl. ("Ex. C") § 24.) The updated dispute resolution section explained that it applied to all claims or disputes between users and iHeart "ARISING OUT OF OR RELATING TO . . . YOUR USE OF OR ACCESS TO THE SITE." (*Id.*) The section further stated in a subsection titled "**Governing Law, Forum Selection, and Venue**," that users "consent to the exclusive jurisdiction of the federal and state courts located in New York City, New York, United States[.]" (*Id.*)

**B. Plaintiff's Allegations Regarding iHeart and its Website.**

iHeart operates the Website where visitors can stream music, podcasts, and radio. (Compl. ¶ 1.) The Complaint alleges that the iHeart Website employs three third-party tools, which Plaintiff describes as "Trackers:" the "ADNXS Tracker," "TripleLift Tracker," and "OpenX Tracker," operated by third parties Microsoft, TripleLift, and OpenX. (*Id.* ¶ 2.) Plaintiff alleges the Trackers are "installed" on the web browsers of all Website visitors. (*Id.*) Through these tools, Plaintiff alleges that iHeart and the third-party operators receive Website users' devices' IP addresses whenever they visit the Website, as well as "Device Metadata." including Website visitors' "device type, browser type, and unique and persistent identifiers." *Id.* Plaintiff does not allege that the Trackers collect information about users' visits to any other website or other online activity. The

only thing they "track" is when Plaintiff visited the iHeart Website. The Complaint alleges that the Trackers are used to serve ads on the Website. (*See*, *e.g.*, Compl. ¶¶ 187, 190, 198.)

The remainder of the Complaint has little to do with iHeart, Plaintiff, or his claims. For example, the Complaint discusses what IP addresses are (six pages), how companies may share information they possess with each other (22 pages), and information about how targeted advertising works (19 pages). None of these allegations change the nature of Plaintiff's claim, which depends entirely on the alleged collection of information about his device, rather than any "downstream" use of that information.

### C. Plaintiff's Alleged Experiences & Claim.

Plaintiff alleges that he visited the Website between 2020 and February 2025, although pleads no fact showing such visits. (*Id.* ¶ 206.) He alleges that at some point during these visits, the Trackers were installed on his browser and collected his device's IP address, along with other information about his device. (*Id.* ¶ 208.) He speculates that this collected information was "synchronized" between various named and unnamed entities in a way that resulted in the creation of "profiles" about him, targeted advertising, and the generation of revenue, although he pleads no facts showing any of these things happened. (*Id.* ¶¶ 208–09.) Based on those allegations he asserts a single claim against iHeart for violation of the California Invasion of Privacy Act ("CIPA"), Section 638.51(a). (*Id.* ¶¶ 229–40.). Plaintiff purports to bring this claim on behalf of every user that visited the Website and had their IP address collected over an unidentified period of time. (*Id.* ¶ 220.)

## III. ARGUMENT

### A. This Matter Should be Transferred to the Southern District of New York Pursuant to the 2025 Terms.

Initially, this matter should be transferred to the United States District Court for the Southern District of New York pursuant to the forum selection clause in Plaintiff's agreement with iHeart. "[A] forum-selection clause may be enforced by a motion to transfer under 28 U.S.C. § 1404(a)." *Atl. Marine Constr. Co. v. U.S. Dist. Court*, 571 U.S. 49, 52 (2013). "The 'enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system.'" *Id.* at 63 (citation omitted). "For that reason, and

because the overarching consideration under § 1404(a) is whether a transfer would promote the interest of justice, a valid forum-selection clause should be given controlling weight in all but the most exceptional cases." *Id.* (cleaned up). "[T]he party seeking to avoid a forum selection clause bears a 'heavy burden' to establish a ground upon which [the court] will conclude the clause is unenforceable." *Voicemail Club, Inc. v. Enhanced Servs. Billing, Inc.,* No. C 12–02189 SI., 2012 WL 4837697, at *2 (N.D. Cal. Oct. 10, 2012) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 17 (1907)). Courts can consider evidence outside the pleadings on § 1404(a) motions. *Stability Sols., LLC v. Medacta USA, Inc.*, No. 22-CV-07412-LB, 2023 WL 350546, at *3 (N.D. Cal. Jan. 20, 2023) (citation omitted).

Here, this dispute cannot proceed in this Court because Plaintiff's agreement requires that he bring any disputes related to his use of or access to the website "exclusively" in the federal or state courts located in New York City. Under that agreement, this case should be transferred to the Southern District of New York because his claim relates to iHeart's Website and there are no extraordinary circumstances barring enforcement of the 2025 Terms' forum selection clause.

**1. Plaintiff's agreement with iHeart includes a forum selection clause.**

Plaintiff is bound by iHeart's forum selection clause because he agreed to the 2024 Terms when creating an account and subsequently agreed to the 2025 Terms.

*a. Plaintiff agreed to the 2024 Terms when creating an iHeart account.*

A party seeking to enforce the terms of an online contract must show that the user had either actual notice of the contract terms or inquiry notice, meaning reasonably conspicuous notice of the terms and manifestation of assent. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). "[A]n enforceable contract will be found based on an inquiry notice theory" when "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). State contract law governs the contract formation question. *Id.* at 855. Both the 2024 and 2025 Terms contain a New York choice of law provision. (Ex. B § 25; Ex. C

§ 24.) "[T]he law governing formation of Internet contracts in New York . . . is materially identical to California's," so the Court may "appl[y] familiar contract formation principles under California law." *See Quamina v. JustAnswer LLC*, 721 F. Supp. 3d 1026, 1037 (N.D. Cal. 2024) (citing *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 87 (2010)), *aff'd sub nom. Godun v. JustAnswer LLC*, 135 F.4th 699 (9th Cir. 2025). Both the 2024 and 2025 Terms explained that if changes were made to either agreement, notice would be provided on the Website and continued use after such changes were posted would constitute acceptance to the revised terms. (Ex. B § 2; Ex. C § 1.)

Under either California or New York law, "if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed." *Patrick v. Running Warehouse, LLC.*, 93 F.4th 468, 476 (9th Cir. 2024). "[A]n enforceable contract will be found based on an inquiry notice theory" when "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* (citation omitted).

*Rainey v. A Place for Rover, Inc.* is instructive. In that case, the court evaluated the sign-in screen depicted below:



*Rainey v. A Place for Rover, Inc.*, No. 22-cv-00403-RGK-E, dkt. 20-1 ECF p. 6 (C.D. Cal. June 10, 2022). The court held that the plaintiff was on inquiry notice of the defendant's terms because the notice was located near the relevant action buttons, and hyperlinked to the defendant's terms "in blue text," which "[stood] out against the rest of the white page." *Rainey v. A Place for Rover, Inc.*, No. 2:22-CV-00403-RGK-E, 2022 WL 16942849, at *2 (C.D. Cal. July 18, 2022). The court also held that plaintiff objectively manifested assent to the defendant's terms by clicking the "Continue with Google" button and going on to use the website. *Id.* at *1. *Accord L.W.A. v. LinkedIn Corp.*, No. 5:24-CV-08436-EJD, 2025 WL 2780788, at *1, *4 (N.D. Cal. Sept. 30, 2025) (evaluating sign-in screen that allowed users to "Sign up for Noom" by providing an email address or "through Apple or Facebook accounts").

Here, iHeart's account creation process similarly bound Plaintiff to the 2024 Terms. First, iHeart's account creation flow put Plaintiff on inquiry notice of the 2024 Terms. Plaintiff began the process by clicking a link next to text stating "Don't have an account?" The next page allowed Plaintiff to "create a free account" in two ways: by providing an email and creating a password, or by connecting with his Facebook or Google account. The "full context" of these screens put Plaintiff on notice that he was entering into "a continuing, forward-looking relationship" governed by terms and conditions. *Id.* at *3 (quoting *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 16 (2021)). The notice on the page additionally explained that by "creating an account, [Plaintiff] also agree[d] to [iHeart's] Terms of Use and Privacy Policy." The hyperlinked phrases "Terms of Use" and "Privacy Policy," which were linked to each document, were underlined to stand out from the rest of the text and indicate a hyperlink. *Nail v. Lens.com, Inc.*, No. 2:24-CV-02531-SB-E, 2024 WL 3723912, at *4 (C.D. Cal. June 20, 2024) (quoting *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1021 (9th Cir. 2024) (endorsing the use of a "customary design element[] denoting the existence of a hyperlink" without the use of a different color). This all appeared on an uncluttered page with text that stood out against the white background. *Id.*

Second, and as in *Rainey*, Plaintiff unambiguously manifested assent to the 2024 Terms by clicking the "Google" button, which was a required step in creating his iHeart account and synced with the language in iHeart's notice. *Rainey*, 2022 WL 16942849, at *1; *see also L.W.A.*, 2025 WL

2780788, at *4 (interface gave users options of "signing up" by clicking various buttons, including ones that linked Apple or Facebook accounts). As Plaintiff moved through the screens in that process, he was repeatedly presented with iHeart's hyperlinked terms, and ultimately told that his Google account would be used to "[s]ign in to iHeartRadio."

Accordingly, Plaintiff agreed to the 2024 Terms when creating his iHeart account.

*b. Plaintiff agreed to the 2025 Terms*

Plaintiff also agreed to the 2025 Terms. Consistent with Section 2 of the 2024 Terms, iHeart provided notice of the updated 2025 Terms by posting them to the Website on March 12, 2025. (Rowe Decl. ¶ 9); *see Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 5339806, at *17 (N.D. Cal. Sept. 23, 2016) (citing *MySpace, Inc. v. The Globe.com, Inc.*, No. CV 06-3391-RGK, 2007 WL 1686966, at *10 (C.D. Cal. Feb 27, 2007) (holding that Gmail users were bound to updated terms documents upon posting to the Gmail website, pursuant to prior agreement where users were advised to "look at the terms regularly [because Gmail would] post notice of modifications to these terms on this page"); *see also DeVries v. Experian Info. Sols., Inc.*, No. 16-CV-02953-WHO, 2017 WL 733096, at *7 (N.D. Cal. Feb. 24, 2017) ("In general, courts have enforced new terms where prior agreements included change-in-terms provisions."). Plaintiff manifested assent to the 2025 Terms because he visited the Website on April 10, 2025, logging in and using the site it to access and stream media, including visiting pages that linked to the 2025 Terms. (Rowe Decl. ¶ 10); *see DeVries*, 2017 WL 733096, at *7 (plaintiff was bound to updated terms because "he visited EIS's website [when the defendant's new updated terms had been posted]."); *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 159 (S.D.N.Y. 2014) (applying New York law and holding that "there is a plausible inference that plaintiff Morris clearly assented to the June 2010 Terms of Use by continuing his use of the website" where prior terms of use include a change-in-terms provision).

**2. The 2025 Terms' forum selection clause applies to this dispute.**

The 2025 Terms forum selection clause, which requires user "consent to the exclusive jurisdiction of the federal and state courts located in New York City, New York, United States," is

part of the 2025 Terms' dispute resolution terms (Section 24). The very first paragraph of the dispute resolution section explains that it "APPL[IES] TO ALL CLAIMS, DISAGREEMENTS, DISPUTES OR CONTROVERSIES BETWEEN YOU AND IHEART . . . ARISING OUT OF OR RELATING TO YOUR USE OF OR ACCESS TO THE SITE, APP, IHEART PREMIUM SERVICES, AND IHEART INTERNET SERVICES." (Ex. C.) Plaintiff's claim explicitly arises out of his "use of or access to the iHeart Website." (Compl. ¶ 2 (alleging that the data collection underlying Plaintiff's Section 638.51 claim occurs "[w]hen users visit the Website").) Accordingly, this dispute falls under the plain language of the 2025 Terms' dispute resolution section and forum selection clause.

**3. The forum selection clause is enforceable.**

The forum selection clause is also enforceable. "Only under extraordinary circumstances unrelated to the convenience of the parties should a motion to transfer pursuant to a forum-selection clause be denied." *Losson v. Union des Ass'ns Europeennes de Football*, No. 23-cv-06500-JSC, 2024 WL 3406987, at *3 (N.D. Cal. July 11, 2024). "[A] forum-selection clause is controlling unless the plaintiff makes a strong showing that: (1) the clause is invalid due to fraud or overreaching, (2) enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision, or (3) trial in the contractual forum will be so gravely difficult and inconvenient that the plaintiff will for all practical purposes be deprived of his day in court." *Lewis v. Liberty Mut. Ins. Co.*, 953 F.3d 1160, 1165 (9th Cir. 2020) (cleaned up) (citing *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1088 (9th Cir. 2018)). Plaintiff cannot make the required showing on any of these prongs.

**No Fraud or Overreaching.** The forum selection clause in the 2025 Terms is not a product of fraud or overreaching. It is clearly set out in Section 24 of the 2025 Terms and nothing about its inclusion is "unusual that would indicate undue influence or overreaching." *LaCross v. Knight Transp., Inc.*, 95 F. Supp. 3d 1199, 1205 (C.D. Cal. 2015).

**No Contravention of Public Policy.** Transferring the case to the Southern District of New York would not contravene a California public policy. *Sun.*, 901 F.3d at 1090 ("[I]n order to prove that enforcement of such a clause 'would contravene a strong public policy of the forum in which suit is brought,' the plaintiff must point to a statute or judicial decision that clearly states such a

strong public policy.") (internal citation omitted). The fact that the 2025 Terms select New York—and not California—law is irrelevant to this analysis. *Cooper v. Slice Techs., Inc.*, No. 17-CV-02340-LB, 2017 WL 4071373, at *3 (N.D. Cal. Sept. 14, 2017) (quoting *Rowen v. Soundview Commc'n, Inc.*, No. 14-CV-5530-WHO, 2015 WL 899294, at *4 (N.D. Cal. Mar. 2, 2015) (transferring case to the Southern District of New York and holding "[c]ourts in the Ninth Circuit have generally agreed that the choice-of-law analysis is irrelevant to determining if the enforcement of a forum selection clause contravenes a strong public policy.")).

**Plaintiff is not deprived of remedies.** Transfer will not "for all practical purposes . . . deprive [Plaintiff] of his day in court." *Lewis*, 953 F.3d at 1169 (quoting *M/S Bremen.*, 407 U.S. at 18 (acknowledging that requiring a California family to bring their claim in Australia would "impose burdens," but holding that burden was not sufficient to overcome forum selection clause). Indeed, Plaintiff's counsel have brought these same CIPA cases on behalf of Californians in the Southern District of New York. *See*, *e.g.*, *Xu v. Reuters News & Media Inc.*, No. 24 CIV. 2466 (PAE), 2025 WL 488501, at *1-2 (S.D.N.Y. Feb. 13, 2025). Thus, even without the forum selection clause, the Southern District of New York is an equally viable venue for this case.

Because Plaintiff agreed to the 2025 Terms and this case concerns Plaintiff's use of or access to the Website, the Court should transfer this matter under 28 U.S.C. § 1404(a).

### B. If the Case Is Not Transferred, Plaintiff Should be Compelled to Arbitration Pursuant to the 2024 Terms.

If Plaintiff claims he is not bound by the 2025 Terms, the Court should compel Plaintiff to pursue his claim in arbitration pursuant to the 2024 Terms. On a motion to compel, a court's role under the Federal Arbitration Act is limited to determining "two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). Both criteria are met here.

First, for the reasons discuss *supra*, § IV.A.1.a., Plaintiff agreed to the 2024 Terms when creating an iHeart account. The 2024 Terms include an agreement to arbitrate disputes. (Ex. B § 23.)

Second, because the 2024 Terms' arbitration agreement incorporates the JAMS arbitration rules, (*id.*), the Court must leave any questions of arbitrability to the arbitrator. In *Brennan v. Opus Bank*, the Ninth Circuit held "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability" because one of the AAA rules gives the arbitrator the power to rule on arbitrability. *Id.* at 1130. "JAMS rules, like AAA rules, give the arbitrator the power to decide arbitrability." *Shansby v. Edrington, USA, Inc.*, No. 22-CV-06907-JSC, 2023 WL 2456789, at *2 (N.D. Cal. Mar. 9, 2023) (collecting cases). "Thus, under *Brennan*, the [2024 Terms'] arbitration provision clearly and unmistakably delegates arbitrability to the arbitrator." *Id.* And even if there were no delegation, Plaintiff's claims unquestionably fall within the scope of the 2024 Terms' arbitration clause, which applies both to "[a]ny dispute . . . arising out of, or connected with, [the 2024 Terms]" *or* "any matters related to this iHeartMedia Site." (Ex. B § 23.) Plaintiff's claims arise out of his relationship to iHeart—which is governed by the 2024 Terms—*and* his visit to the iHeartMedia Site. Either way, his dispute falls within the scope of the arbitration agreement.

### C. If the Court Does Not Transfer the Case or Compel Arbitration, Plaintiff's Claim Must Be Dismissed.

#### 1. Plaintiff does not allege a concrete Article III injury.

If the Court does not order transfer or arbitration, the Complaint must be dismissed on jurisdictional grounds because Plaintiff does not demonstrate a "concrete" injury sufficient to establish standing under Article III. *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021).

If a plaintiff lacks Article III standing to bring a suit, the federal court lacks subject-matter jurisdiction and the suit must be dismissed. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). To establish standing, the plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To satisfy this first prong, Plaintiff must allege an injury that is "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 339 (cleaned up). His injury must be "'real,' and not 'abstract.'" *Id.* at 340. Such a showing is required even when a plaintiff alleges a statutory violation: "Congress'

role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at 341. In other words, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* As the Ninth Circuit recently explained, "*TransUnion* clearly cautions courts not to treat an injury as concrete for Article III purposes based only on Congress's say-so." *Popa*, 2025 WL 2448824, at *5 (citing *TransUnion*, 594 U.S. at 426) (cleaned up)). Thus, allegations of privacy violations must "demonstrate more than just a statutory violation when evaluating whether a plaintiff has alleged a concrete injury." *Id.* at *7; *see also Lightoller v. Jetblue Airways Corp.*, No. 23-CV-00361-H-KSC, 2023 WL 3963823, at *3 (S.D. Cal. June 12, 2023) ("Under the Supreme Court's holding in *TransUnion*, a bare CIPA violation by itself is insufficient to demonstrate Article III injury in fact.").

History is the "touchstone for concreteness." *Popa*, 2025 WL 2448824, at *4. An injury is "concrete" if it bears a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* (citing *TransUnion*, 594 U.S. at 424) (cleaned up). To make this showing, a plaintiff must identify a "close historical or common-law analogue for [his] asserted injury." *TransUnion*, 594 U.S. at 424. This requires an examination into the "*specific* underlying harm experienced" and a detailed comparison with the "*specific* common-law tort." *Popa*, 2025 WL 2448824, at *4 (emphasis in original).

The Ninth Circuit's recent decision in *Popa* demonstrates the application of these standards in the context of online analytics-based claims. *Popa* centered on the defendant companies' use of third-party vendors' "session-replay technology" on their websites, which allegedly captured over 30 different categories of website visitors' information (including mailing address, device information, and text entered on the website) and enabled the defendants to "recreate website visitors' entire visit." *Id.* at *2. The Ninth Circuit held that the plaintiff failed to establish Article III standing because she did not explain how the defendants' use of session-replay technology caused her harm "remotely similar" to the harms actionable under the common law torts of intrusion upon seclusion or public disclosure of private facts. *Id.* at *5. As the court explained, these common law torts require "*highly offensive*" interferences or disclosures, such as the collection of "embarrassing,

invasive, or otherwise private information"—e.g., taking intimate pictures of a neighbor's upstairs bedroom with a telescopic lens, or publishing a picture of a mother nursing her child without consent. *Id.* By contrast, the *Popa* court found that the use of session-replay technology "seems most similar to a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems that disrupt potential sales." *Id.* Because the website tracking technology did not cause the plaintiff to suffer an injury analogous to traditional privacy tort harms, she could not allege a concrete injury and lacked standing.

Recent decisions from within this Circuit have dismissed complaints on the grounds that collecting IP address and device metadata – i.e., the same type of information addressed by *Popa* and at issue in pen register cases – is not a sufficiently concrete harm to confer standing. In *Khamooshi v. Politico LLC*, the court considered whether the collection of "browser and device data, IP address, and 'other identifying information'" by "third-party trackers" on the defendant's website constituted an invasion of privacy and, in turn, a concrete injury. 786 F. Supp. 3d 1174, 1177, 1179 (N.D. Cal. 2025). In finding that it was not, the court explained that (i) users have no expectation of privacy in IP addresses because they are "voluntarily turned over in order to direct the third party's servers" any time a website is visited and (ii) the collection of IP addresses cannot map onto any traditional privacy tort because they "are information about an address associated with a device, not sensitive personal information." *Id.* at 1179–80. Citing *TransUnion*, the court additionally rejected the notion that any "violation of [CIPA] automatically constitutes a concrete injury." *Id.* at 1180. Finally, the court rejected that the defendant's alleged profiting from its use of collected IP addresses was "unjust" and created an economic injury. As the court explained, "[j]ust as a retailer might profit from the use of home addresses without being *unjustly* enriched, Plaintiffs ha[ve] not shown why Defendant's use of their IP addresses was unjust." *Id.* at 1183 (emphasis in original).

Similar concerns resulted in dismissal in *Kishnani v. Royal Caribbean Cruises Ltd.*, No. 25-CV-01473-NW, 2025 WL 1745726 (N.D. Cal. June 24, 2025), *appeal filed*, No. 25-4452 (9th Cir. July 18, 2025). There, the plaintiff alleged that an analytics pixel on the defendant's website allowed third-party TikTok to collect "device and browser information, geographic information, referral tracking, and URL tracking" from website visitors and "match[] it with existing data that TikTok has

acquired" to "fingerprint" visitors. *Id.* at *3. The court held that those allegations did not amount to an Article III injury because "[t]he mere collection of basic contact information by software, or where the plaintiffs merely visited the website, are not concrete harms." *Id.* at *4 (cleaned up) (quoting *Smidga v. Spirit Airlines, Inc.*, No. 2:22-CV-1578-MJH, 2024 WL 1485853, at *4 (W.D. Pa. Apr. 5, 2024) and citing collected cases). In particular, the court held that "it is well established in the Ninth Circuit that 'there is no legally protected privacy interest in IP addresses,'" and, thus, the alleged collection of that information could not support an Article III injury. *Id.* (quoting *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020)); *accord Mitchener v. CuriousityStream, Inc.*, No. 25-CV-01471-NW, 2025 WL 2272413, at *4 (N.D. Cal. Aug. 6, 2025), *appeal filed*, No. 25-4990 (9th Cir. Aug. 7, 2025).

Numerous other courts from within the Ninth Circuit have reached the same results on analogous facts. *See, e.g.*, *Carolus v. Nexstar Media Inc.*, No. 24-CV-07790-VC, 2025 WL 1338193, at *1 (N.D. Cal. Apr. 9, 2025) ("Nexstar's acquisition of [the plaintiff's IP address information] does not cause the kind of [privacy] harm that can be vindicated in federal court", and rejecting economic theory of harm because the plaintiffs "provide no allegations about the potential monetary value of their IP addresses nor any theory for how (or to what degree) the value of that information decreases when Nexstar tracks it on The Hill website."). In matters like this one, case after case explains that Article III requires courts to ask whether "the information at issue is actually personal and private and whether it bears a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* (cleaned up). If the information collected is not private, or the harm alleged is not similar to a traditional privacy tort, then a plaintiff lacks standing. *Id.* That is precisely the case here: IP address and "Device Metadata" is not personal or private information.

Courts outside the Ninth Circuit have similarly recognized that the collection of an IP address or similar data is not a concrete harm sufficient to confer standing. An undeniably on-point decision is *Xu v. Reuters News & Media Inc.*, where the Southern District of New York evaluated effectively the same allegations and claims at issue here (brought by the same attorneys representing Plaintiff in this matter) and dismissed the case for lack of Article III standing. 2025 WL 488501. In *Xu*, like

here, the plaintiff alleged that "three web trackers" were installed on the plaintiff's browser and captured information, including the plaintiff's IP address. *Id.* at *1. Exactly as Plaintiff alleges here, the *Xu* plaintiff also alleged that the third parties operating the trackers used the collected information "to analyze Website data and marketing campaigns, conduct targeted advertising, and ultimately boost [Reuters's] and advertisers' revenue." *Id.* at *3. The court held that these allegations did "not come close to carrying [plaintiff's] burden" to demonstrate the plaintiff's Article III standing because the plaintiff did not allege facts showing that "he has suffered the type of concrete injury that courts have commonly recognized as supporting standing, such as physical, monetary, or reputational harm." *Id.* Indeed, the court noted that while plaintiff alleged the possibility that his information could be used for targeted advertising, "the Complaint does not allege that Xu received any targeted advertising or was otherwise affected, much less that Xu was concretely harmed by any such advertising." *Id.* In short, the court held that the plaintiff "allege[d] only a 'bare procedural violation' of CIPA—that Reuters collected the IP address of Xu's device without court authorization—entirely 'divorced from any concrete harm,'" and emphasized that "[f]ederal courts have widely so held in dismissing similar claims." *Id* at *3–4. (citing collected cases); *accord Gabrielli v. Insider, Inc.*, No. 24-CV-01566 (ER), 2025 WL 522515, at *8 (S.D.N.Y. Feb. 18, 2025) (no Article III injury from alleged Section 638.51 violation).

All these principles and cases demonstrate Plaintiff's lack of standing here. Plaintiff alleges he suffered an injury when iHeart's Website, including via the Trackers, collected his IP address and "device metadata." (Compl. ¶ 2.) But as all of the cases identified above explain, the collection of such data is not sufficiently analogous to the harms of any traditional privacy tort to confer standing. That is because it is well settled that there is no implicit privacy interest in such information. *Heeger*, 509 F. Supp. 3d at 1189 ("[P]laintiffs do not have standing . . . Plaintiffs do not plausibly allege anything more than the collection of IP addresses, and there is no legally protected privacy interest in IP addresses.); *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) ("Internet users have no expectation of privacy in the . . . IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information."); *United States v. Heckenkamp*, 482 F.3d 1142, 1148 (9th Cir.

2007) (holding that a defendant had "no reasonable expectation of privacy" in "network logs" that contained his computer's IP address); *United States v. Hagood*, No. CR–13–00393 RMW, 2014 WL 2918271, at *2 (N.D. Cal. June 26, 2014) ("As a general matter courts have not recognized any reasonable expectation of privacy in an IP address."); *United States v. Rosenow*, 50 F.4th 715, 737–38 (9th Cir. 2022). Thus, while the Complaint posits an amorphous "right to determine who does and does not get to know one's information," (Compl. ¶ 171), the Ninth Circuit has expressly rejected the notion that privacy rights "pitched at a high level of generality" map onto any of the "four discrete torts that protect[] specific kinds of privacy-related harms" and, thus, can anchor a plaintiff's standing to sue. *Popa*, 2025 WL 2448824, at *6. Nor do Plaintiff's conclusory allegations that he was subject to targeted advertising change matters. Even if those allegations are credited, he does not allege any facts explaining how he was "concretely harmed by any such advertising." *Xu*, 2025 WL 488501, at *3. Likewise, while the Complaint includes cursory statements suggesting that iHeart or the third-party operators of the Trackers had their revenue "boosted," Plaintiff does not allege how that harmed or even affected him. *Khamooshi*, 786 F. Supp. 3d at 1183; *accord Xu*, 2025 WL 488501, at *3 ("To state the obvious, Reuters's increasing its revenue, by itself, does not harm Xu.").

In sum, Plaintiff "does not come close to carrying [his] burden" of mapping his alleged "harm" onto one traditionally recognized as providing a basis for a lawsuit or otherwise show that any conduct attributable to iHeart caused a concrete injury in fact. *Xu*, 2025 WL 488501, at *3. He lacks standing.

**2. Plaintiff Fails to Show that iHeart Employed a Pen Register.**

Even if this matter were not subject to transfer and Plaintiff had standing to sue in federal court, his Complaint fails to state a Section 638.51 claim and must be dismissed under Fed. R. Civ. P. 12(b)(6) for at least two reasons. First, Plaintiff does not allege that the Trackers operate as "pen registers" because he does not allege they collect information about the dialing, routing, addressing, or signaling information relating to the websites *he* visited. Instead, the Complaint alleges only that the Trackers identify Plaintiff's browser as the source of its own communications. To the extent that counts as "tracking" even in a colloquial sense (i.e., in the same way the recipient of an email "tracks" the email's sender because he or she necessarily receives the sender's email address), it

does not implicate Section 638.51. Second, Plaintiff cannot sue under Section 637.2 without plausibly alleging an injury. Plaintiff cannot do that here because he does not allege how the collection of his IP address or device information—something that happens with every single interaction over the internet—resulted in any harm whatsoever.

**a. Pen registers collect *outgoing* dialing, routing, addressing, or signaling information—not the source of those communications.**

Plaintiff's Section 638.51 theory is that because the Trackers (i.e., cookies) installed on his internet browser collected his IP address and device information, they operated as unlawful "pen registers." But under his own theory, Plaintiff only alleges the Trackers collect information about the *source* of communications made to the Website (i.e., his device), rather than the outgoing dialing, routing, addressing, or signaling information sent *from that source* (e.g., the IP addresses of the websites visited by Plaintiff's device). Those facts do not plead a pen register as a matter of law.

A pen register or trap and trace device records dialing, routing, addressing, or signaling ("DRAS") information transmitted *by* a monitored facility (pen register) or *to* a monitored facility (trap and trace). *See* Cal. Penal Code §§ 638.51–53; *see also* Sen. Comm. of Public Safety, analysis of Assem. Bill No. 929, (2015–2016 Reg. Sess.) June 15, 2015, p. 15 (describing a trap and trace device as one that allows law enforcement "to record what numbers have called a specific telephone line"). In other words, a regulated device identifies the source of all communications *to or from* a monitored account. For example, the pen registers in *Smith v. Maryland* and *United States v. Giordano* recorded all phone numbers dialed *from* the criminal defendant's telephone. *Smith*, 442 U.S. 735, 737 (1979); *Giordano*, 416 U.S. 505, 549 (1974) (Powell, J., concurring). Similarly, the pen register in *United States v. Forrester* recorded the IP address of every website that the criminal defendant visited—the internet equivalent of outgoing phone numbers. 512 F.3d at 504. Trap and trace devices do the inverse and record "what numbers call a specific telephone, i.e. all incoming phone numbers." *In re U.S. for Ords. (1) Authorizing Use of Pen Regs. & Trap & Trace Devices*, 515 F. Supp. 2d 325, 328 n.2 (E.D.N.Y. 2007). Case after case makes clear that a pen register or trap and trace device works by taking a target account and monitoring all contacts that flow from or to that account. *See United States v. Torres*, 908 F.2d 1417, 1420 (9th Cir. 1990); *see also Smith*, 442

U.S. at 736 n.1 ("A pen register is usually installed at a central telephone facility and records on a paper tape all numbers dialed from the line to which it is attached.") (cleaned up).

This basic structure is reflected in the definitional sections underlying Section 638.51. A "trap and trace device" tracks "incoming electronic or other impulses" made to a targeted account, including DRAS information that is "reasonably likely to identify *the source* of a wire or electronic communication." Cal. Penal Code § 630.50(c) (emphasis added). A "pen register," on the other hand, tracks outgoing DRAS information that is "transmitted by an instrument or facility." Cal. Penal Code § 630.50(b). A pen register does not collect DRAS information to identify "the source" of any transmitted information; there would be no point in collecting that information because the source (e.g., a targeted phone number or, here, targeted internet device with a static IP address) is known and unchanging. *Aviles v. LiveRamp, Inc.*, No. 24STCV19869, 2025 WL 487196, at *2 (Cal. Super. Ct. Jan. 28, 2025), *adopted as final order*, 2025 WL 487199 (Jan. 25, 2025) ("The analog of the number dialed by a telephone here is the IP address and related information of a website accessed by a computer[.]"). Similarly, a trap and trace device does not collect information about the recipient of any DRAS information because the recipient (e.g., a targeted phone number) is also known and unchanging. Plaintiff himself acknowledges this structure and the converse relationship between pen registers and trap and trace devices, noting that "[h]istorically, law enforcement used 'pen registers' to record the numbers *of outgoing calls from a particular telephone line*, while law enforcement used 'trap and trace devices' to record the numbers *of incoming calls* to that particular telephone line." (Compl. ¶ 19 (emphasis added).)

Here, Plaintiff does not allege that he was tracked by a pen register. While he alleges that the Trackers were placed on this internet browser, he does not allege those Trackers recorded any *outgoing* DRAS information sent *from* his browser to another target. Contrary to the circumstances addressed in *Forrester*, 512 F.3d at 504 (addressing "computer surveillance that enabled the government to learn . . . the [IP] addresses of the websites [the defendant] visited" as "analogous to the use of a pen register"), Plaintiff does not allege that any of the Trackers recorded the IP address of every (or even any) website he visited—i.e., the equivalent of "law enforcement . . . record[ing] the number of outgoing calls from a particular telephone line." (Compl. ¶ 19.) Instead, he alleges that

when installed on an internet browser, the Trackers identified the *source* of incoming requests the Website received. (*See, e.g.*, *id.* ¶ 2.) But as the *LiveRamp* court and the definitional sections of Section 638.51 explain, technology that identifies the source of a communication—i.e., a "computer's own IP address or identifying information"—is by definition not a pen register. 2025 WL 487196, at *2. Indeed, because Plaintiff alleges that the Trackers record *the source of incoming transmissions*, he at best alleges what would be a trap and trace installed on the Website: a process that collects all inbound IP addresses (or other DRAS information) that visit the iHeart Website. For obvious reasons, Plaintiff cannot sue for iHeart's alleged installation of a trap and trace device on itself. **He was not "tracked" any more than a person with a smartphone or answering machine "tracks" individuals who call them by receiving and recording their phone numbers, or a person with an email account "tracks" individuals who send them messages by receiving their email addresses.**

Any other interpretation would be absurd. If a website's collection of visitors' IP address violated CIPA—through "trackers" or otherwise—the Internet could not function because a user cannot load or browse a website without transmitting his or his IP address. "An IP address operates much like a phone number, and like telephone companies, internet service providers require that identifying information be disclosed in order to make communication among electronic devices possible." *United States v. Soybel*, 13 F.4th 584, 594 (7th Cir. 2021) (cleaned up). Plaintiff himself acknowledges this. (Compl. ¶ 35 ("A public IP address is like the number for a landline telephone for a household.").) And "like telephone companies, internet service providers require that identifying information be disclosed in order to make communication among electronic devices possible." *Soybel*, 13 F.4th at 594 (cleaned up); *see also Forrester*, 512 F.3d at 510 (the Ninth Circuit noting that "IP addresses . . . are voluntarily turned over in order to direct the third party's servers"). This means that under Plaintiff's reading, because websites *must* receive IP addresses from their visitors, every website owner would first have to secure a criminal court order just to operate, or else expose itself to civil and criminal liability. *See* Cal. Penal Code § 638.51(c). Courts should not construe a statute to create absurd results. *In re Michele D.*, 29 Cal. 4th 600, 606 (2002). Additionally, the fact that the alleged "Trackers" at issue here are associated with third parties is

irrelevant. Under Plaintiff's theory, iHeart would be equally liable if it installed its own "Trackers" (such as a first-party cookie to keep plaintiff logged into the Website) because that cookie would be a "'device[s] or process[es]' that capture[d] the 'routing, addressing, or signaling information'—the IP address, Device Metadata, and unique user IDs—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones (i.e., 'instruments')." (Compl. ¶ 233.)

Courts analyzing these basic principles have dismissed lawsuits based on allegations that a website operator violates Section 638.51 by collecting IP address and other DRAS information, whether directly or through its vendors. In *Aviles v. LiveRamp*, exactly like this case, the plaintiff alleged that the defendant's website installed third-party trackers (he called them "beacons") on the plaintiff's browser that "collect[ed] the IP addresses of visitors," along with "additional information about the user's device and software" and "email address[es]." 2025 WL 487196, at *1. The court held the plaintiff did not allege the use of a pen register because while the complaint alleged that the defendant or its vendors received information about the plaintiff and his computer, there were no allegations "that the Beacon—or any other software installed on users' devices by the Website—collect[ed] the *outgoing addressing information from* visitors' devices or browsers." *Id.* at *2 (emphasis added). The court also held that the defendant's collection of information about its website visitors was not a trap and trace because the Plaintiff did not allege "that Defendant installed software on *Plaintiff's* device or browser that collected incoming contact information to *Plaintiff's* device." *Id.* at *3 (emphasis in original). As the court summed up, the "Plaintiff [had] not alleged anything above and beyond how the internet normally works." *Id.*

Addressing similar facts, the court in *Aviles v. Hitachi Vantara LLC* reached the same conclusion. There, the plaintiff also complained that "beacons" placed on his browser by the defendant's website similarly collected information about the plaintiff's device. *Aviles v. Hitachi Vantara LLC*, No. 24STCV19162, Minute Order at 1 (Cal. Super. Ct. Aug. 28, 2025). As in *LiveRamp*, the court held "that section 638.51 is not applicable based on the facts currently alleged . . . [because the] Plaintiff does not allege that Defendant's Website collects either outgoing information . . . *from* Plaintiff's computer or incoming information *directed toward* Plaintiff's computer." *Id.* at 6 (emphasis added). Other courts have similarly rejected the notion that a website

operator can violate Section 638.51 by simply collecting IP address or related information through its vendors or otherwise. *See Rodriguez v. Sparc Grp. LLC*, No. 24STCV26946, Tentative Ruling Granting Demurrer, *as adopted*, at 3 (Cal. Super. Ct. July 9, 2025) ("The prohibition in the trap and trace device statute is related to the surreptitious monitoring of incoming communications to the target—here, Plaintiff. That would make it analogous to the law enforcement tool that allows law enforcement to record what numbers have called a specific phone line. This is a far cry from the situation here, where Plaintiff voluntarily and intentionally chooses to contact the Defendant website and Defendant is learning the identity of the person contacting it."); *Garcia v. Diversified Foodservice Supply, LLC*, No. 24STCV19784, Notice of Ruling at *8 (Cal. Super. Ct. June 24, 2025) ("Section 638.51 did not intend to criminalize the process by which all websites communicate with all users who choose to access them."); *Licea v. Hickory Farms LLC*, No. 23STCV26148, 2024 WL 1698147, at *4 (Cal. Super. Ct. Mar. 13, 2024) (rejecting Section 638.51 claim and noting that "Plaintiff's potential interpretation of privacy laws as one rendering every single entity voluntarily visited by a potential plaintiff, thereby providing an IP address for purposes of connecting the website, as a violator").

There are, of course, a handful of federal decisions denying motions to dismiss Section 638.51 claims based on factual allegations similar to those pleaded here. But none of those decisions grapple with, or even address, the core mismatch between the theory pleaded here and the definition of a "pen register" provided in Section 638.50. For example, in *Garon v. Keleops USA, Inc.*, Chief Magistrate Judge Ryu denied a motion to dismiss a Section 638.51 claim alleged in a complaint like the one pleaded here. No. 25-CV-02124-DMR, 2025 WL 2522374 (N.D. Cal. Sept. 2, 2025). While the defendant argued that the claim failed because—as iHeart argues here—the alleged trackers only collected DRAS information that related to the *source* of a communication (and, in turn, could not be a pen register as a matter of law), the court declined to address the argument altogether. Instead, it held that because IP addresses *are* routing information, allegations that IP addresses are collected were sufficient to state Section 638.51 claim. *Id.* at *4. But as discussed above, if the DRAS information collected relates to the "source" of a communication (rather than the recipient of it), that collection by definition *cannot* be a pen register. *Compare* Cal. Penal Code § 638.50(c) (definition of

trap and trace device as capturing DRAS information concerning the *source* of a communication) *with* Cal. Penal Code § 638.50(b) (definition of pen register as capturing *transmitted* DRAS information). To again use Plaintiff's own articulation of the issue, the information is not "outgoing" in the same way that "record[ing] the numbers of outgoing calls from a particular telephone line" is outgoing. (Compl. ¶ 19.) The cases that *Garon* primarily relies on—*Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050–51 (S.D. Cal. 2023); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 928 (N.D. Cal. 2024); and *Mirmalek v. Los Angeles Times Comunications LLC*, No. 24-CV-01797-CRB, 2024 WL 5102709 (N.D. Cal. Dec. 12, 2024)—do not address this issue either. *See Garon*, 2025 WL 2522374, at *5 ("The court is persuaded by the reasoning in *Greenley, Shah*, and *Mirmalek*[.]"). Accordingly, these have no weight in assessing whether Plaintiff can state a "pen register" claim under Section 638.51 by only alleging that "source" DRAS information is collected by a single website that Plaintiff accessed. For all the reasons discussed above, he cannot.

Finally, Plaintiff cannot overcome this core pleading deficiency by padding his Complaint with page after page (after page after page) of allegations explaining that *after* the Trackers collect Plaintiff's IP address and device metadata, the entities operating them can allegedly correlate the collected data with information held by other parties (including each other) to get a more complete sense of Plaintiff's online activity. Even if these services allowed iHeart to engage in conduct like "targeted advertising" or "identity resolution," as Plaintiff alleges, all of that is "downstream use of data," which is "not a part of the definitions of pen registers or trap and trace devices." *LiveRamp*, 2025 WL 487196, at *3. Because Section 638.51 addresses "the method of data collection," not what companies might choose to do with any collected data, these "downstream" data matching activities have no relevance whatsoever to whether iHeart used a pen register (or a trap and trace device) as contemplated by CIPA. *Id.*

To the extent there is any question about whether the conduct described in the Complaint constitutes use of a "pen register" (it does not), that question is laid to the rest by the fact that notwithstanding the Complaint's use of scare terminology, this conduct has been commonplace and accepted for decades. For example, the Southern District of New York described the practice Plaintiff complains about as early as 2001 in *In re DoubleClick Inc. Privacy Litigation*, describing

how DoubleClick, "the largest provider of Internet advertising products and services in the world," specialized in "collecting, compiling and analyzing information about Internet users through proprietary technologies and techniques, and using it to target online advertisements. 154 F. Supp. 2d at 500. To do so, DoubleClick placed a "cookie" storing "personal information" on users' devices when they visited any of 1,500 websites in the "DoubleClick Network," and then "identifie[d] the user's profile by the cookie identification number and runs a complex set of algorithms based, in part, on the user's profile, to determine which advertisements it will present to the user." *Id.* at 502–03. In the decades since, numerous courts have addressed the same practice. *See, e.g.*, *In re Nickelodeon Consumer Priv. Litig.*, No. 12–07829, 2014 WL 3012873, at *13 n.12 (D.N.J. July 2, 2014) (describing how Google uses cookies to "track the Plaintiffs' communications with other websites on which Google places advertisements"); *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 130 (3d Cir. 2015) ("The delivery of advertising content from third party servers to webpage visitors' browsers is a highly technical process involving a series of communications between the visitor's browser, the server of the visited website, and the server of the advertising company."). None of those courts have even suggested this conduct could constitute an illegal pen register. Nor has any federal or state law enforcement agency prosecuted any company for this open conduct under any federal or state pen register law. That is because the collection of a users' IP addresses when they visit a website, either by the website itself or its third-party vendors, is simply not a pen register. It is how the Internet works. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 987 n.1 (2005) ("IP addresses identify computers on the Internet, enabling data packets transmitted from other computers to reach them.").

**b. Plaintiff does not allege an actionable CIPA injury.**

Plaintiff's Section 638.51 claim additionally fails because he does not allege an injury as required to bring a claim under Section 637.2. Unlike discrimination statutes where "any person" can sue, *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (discussing Fair Housing Act's private right of action afforded to "any person," including testers), CIPA Section 637.2 only creates a private right of action for a person who "has been injured by a violation of" the statute. While a

plaintiff need not show quantifiable damages to bring a CIPA claim, he must at minimum show that his privacy was invaded. *See Friddle v. Epstein*, 16 Cal. App. 4th 1649, 1660, *modified on denial of reh'g* (July 7, 1993) (holding that Section 637.2 was intended to provide monetary recovery "for persons whose privacy has been invaded"). In cases like this one, then, courts require a plaintiff to at least allege the collection of some private information. *See, e.g.*, *Ribas v. Clark*, 38 Cal. 3d 355, 364–65 (1985) (rejecting § 637.2 claim that did not stem from a privacy infringement).

Here, while Plaintiff's failure to allege a privacy injury demonstrates his lack of Article III standing, it additionally shows that he lacks statutory standing to assert a Section 637.2 claim in any court. Indeed, for all of the same reasons discussed *supra*, § IV.A., state courts have sustained demurrers in analogous CIPA Section 638.51 cases where a plaintiff fails to allege the defendant's conduct caused the plaintiff a privacy injury. *See, e.g.*, *Sanchez v. Cars.com, Inc.*, No. 24STCV13201, 2025 WL 487194, at *5 (Cal. Super. Ct. Jan. 27, 2025) (sustaining demurrer and holding "even if, arguendo, the collection of Plaintiff's IP address constitutes operation of a pen register, Plaintiff has no reasonable expectation of privacy of her computer's IP address since she chose to access the Website"); *Casillas v. Transitions Optical, Inc.*, No. 23STCV30742, 2024 WL 4873370, at *6–7 (Cal. Super. Ct. Sept. 9, 2024) (sustaining demurrer because alleged collection of IP address was not an "invasion of privacy"); *Rodriguez v. Fountain9, Inc.*, No. 24STCV04504, 2024 WL 4905217, at *4 (Cal. Super. Ct. Nov. 21, 2024) (granting demurrer because alleged collection of IP address did not plead an injury or demonstrate a causal connection to any privacy harm).

## IV. CONCLUSION

This matter does not belong in this Court. It belongs in either the Southern District of New York or arbitration. Plaintiff also has not alleged a concrete injury sufficient to confer Article III standing. Nor can he allege a plausible § 638.51 claim. The case should therefore be transferred, compelled to arbitration, or dismissed (where any dismissal should be with prejudice as Plaintiff cannot allege facts sufficient to cure these deficiencies).

///

///

Dated: October 10, 2025

ZWILLGEN LAW LLP

By: */s/ Sheri Pan*
Sheri Pan (SBN 316136)
sheri@zwillgen.com

*Attorneys for Defendant*
*iHeartMedia, Inc.*