**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
klynn@bursor.com
jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty (*pro hac vice forthcoming*)
Carol Villegas (*pro hac vice forthcoming*)
Jonathan D. Waisnor (State Bar No. 345801)
James M. Fee (*pro hac vice forthcoming*)
Danielle Izzo (*pro hac vice forthcoming*)
140 Broadway New York, NY 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

TREVOR HARRIS, individually and on behalf of all other persons similarly situated,

Plaintiff,

v.

IHEARTMEDIA, INC.,

Defendant.

Case No. 5:25-cv-06038-EKL

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER, COMPEL ARBITRATION, OR DISMISS**

Date: December 17, 2025
Time: 10:00 a.m.
Ctrm: 7, 4th Floor
Judge: Hon. Eumi K. Lee

## TABLE OF CONTENTS


PAGE

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. DEFENDANT'S MOTION TO COMPEL ARBITRATION MUST BE DENIED BECAUSE DEFENDANT HAS NOT MET ITS BURDEN TO SHOW HARRIS'S NOTICE OF OR UNAMBIGUOUS ASSENT TO THE 2024 ..... 2

A. Defendant Has Not Met Its Burden To Show Harris Was On Notice Of Defendant's 2024 Terms ..... 3

1. The Design And Content Of The Account Creation Page Have Multiple Indicia Of Inconspicuousness ..... 3

2. Defendant's Arguments And Authorities Are Unpersuasive ..... 5

B. Defendant Has Not Met Its Burden To Show Harris Unambiguously Assented To Defendant's 2024 Terms ..... 7

II. DEFENDANT'S MOTION TO TRANSFER MUST BE DENIED BECAUSE DEFENDANT HAS NOT MET ITS BURDEN TO SHOW HARRIS'S NOTICE OF OR UNAMBIGUOUS ASSENT TO THE 2025 TERMS ..... 9

III. HARRIS HAS BEEN CONCRETELY INJURED BY DEFENDANT'S INSTALLATION AND USE OF THE TRACKERS ..... 13

A. Defendant's Installation And Use Of The Trackers Facilitated The Profiling Of Harris And The Widespread Dissemination Of That Profile To Advertisers Without Consent ..... 13

B. Defendant Was Unjustly Enriched Through Its Installation And Use Of The Trackers ..... 15

C. Defendant's Arguments And Authorities Are Unpersuasive ..... 16

IV. HARRIS HAS SUFFICIENTLY PLED A CIPA § 638.51 CLAIM UNDER THE PREVAILING LAW OF THIS DISTRICT ..... 19

A. Under The Plain Text Of The Statute And Caselaw, The Trackers Record "Routing, Addressing, Or Signaling Information" Transmitted By Harris's Computer ..... 19

B. Defendant's Policy Arguments Are Precluded By The Plain Text Of The CIPA, And Are Unpersuasive In Any Event ..... 22

C. Defendant's Argument Concerning "Downstream" Consequences Is Both Off-Point And A Misnomer ..... 24

V. HARRIS HAS STATUTORY STANDING UNDER THE CIPA ..... 25

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Aviles v. LiveRamp, Inc.*,
2025 WL 487196 (Super. Ct. Los Angeles Cnty. Jan. 28, 2025) .......... 21

*Benson v. Double Down Interactive, LLC*,
798 F. App'x 117 (9th Cir. 2020) .......... 11

*Berman v. Freedom Financial Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... passim

*Carolus v. Nexstar Media Inc.*,
2025 WL 1338193 (N.D. Cal. Apr. 9, 2025) .......... 18, 25

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) .......... passim

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 22

*Crano v. Sojern, Inc.*,
2025 WL 2689267 (N.D. Cal. Sept. 19, 2025) .......... 2

*Cruz v. Tapestry, Inc.*,
113 Cal. App. 5th 943 (2d Dist. 2025) .......... 5, 6

*Deivaprakash v. Condé Nast Digital*,
2025 WL 2779193 (N.D. Cal. Sept. 30, 2025) .......... 13

*Deivaprakash v. Condé Nast Digital*,
2025 WL 2541952 (N.D. Cal. Sept. 4, 2025) .......... passim

*Dellasala v. Samba TV, Inc.*,
2025 WL 3034069 (N.D. Cal. Oct. 30, 2025) .......... 16

*DeVries v. Experian Info. Sols., Inc.*,
2017 WL 733096 (N.D. Cal. Feb. 24, 2017) .......... 12

*Edwards v. MUBI, Inc.*,
773 F. Supp. 3d 868 (N.D. Cal. 2025) .......... 2, 4

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. 2025) .......... 14

*Fregosa v. Mashable, Inc.*,
2025 WL 2886399 (N.D. Cal. Oct. 9, 2025) .......... 1, 20, 22, 24

*Gabrielli v. Insider, Inc.*,
2025 WL 522515 (S.D.N.Y. Feb. 18, 2025) .......... 17

*Gabrielli v. Motorola Mobility LLC*,
2025 WL 1939957 (N.D. Cal. July 14, 2025) .......... 14, 22

*Garon v. Keleops USA, Inc.*,
2025 WL 2522374 (N.D. Cal. Sept. 2, 2025) .......... 20, 21

*Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025) .......... 3, 4, 8

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) .......... 15

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) .......... 18

*Hines v. Overstock.com, Inc.*,
668 F. Supp. 2d 362 (E.D.N.Y. 2009) .......... 9

*In re Accellion, Inc. Data Breach Litig.*,
2025 WL 2799102 (N.D. Cal. Sept. 30, 2025) .......... 14

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 21

*In re Google RTB Consumer Privacy Litig.*,
606 F. Supp. 3d 935 (N.D. Cal. 2022) .......... 16

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) .......... 3, 9, 11, 12

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) .......... 14

*Keebaugh v. Warner Bros. Entertainment Inc.*,
100 F.4th 1005 (9th Cir. 2024) .......... 6

*Khamooshi v. Politico LLC*,
2025 WL 2822879 (N.D. Cal. Oct. 2, 2025) .......... 17

*Kishnani v. Royal Caribbean Cruises Ltd.*,
2025 WL 1745726 (N.D. Cal. June 24, 2025) .......... 17

*L.W.A. v. LinkedIn Corp.*,
2025 WL 2780788 (N.D. Cal. Sept. 30, 2025) .................................................................. 6, 7

*Lee v. Plex, Inc.*,
773 F. Supp. 3d 755 (N.D. Cal. 2025) ..................................................................... 2, 4, 6, 8

*Lesh v. Cable News Network, Inc.*,
767 F. Supp. 3d 33 (S.D.N.Y. 2025)........................................................................ 1, 18, 20

*Matera v. Google Inc.*,
2016 WL 5339806 (N.D. Cal. Sept. 23, 2016) .................................................................... 12

*McClung v. AddShopper, Inc.*,
2024 WL 189006 (N.D. Cal. Jan. 17, 2024) ................................................................. 15, 25

*Mirmalek v. Los Angeles Times Communications LLC*,
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) ..................................................................... 20

*Mitchener v. CuriousityStream, Inc.*,
2025 WL 2272413 (N.D. Cal. Aug. 6, 2025)....................................................................... 17

*Moody v. C2 Educational Sys. Inc.*,
742 F. Supp. 3d 1072 (C.D. Cal. 2024)............................................................................ 1, 20

*MySpace, Inc. v. The Globe.com, Inc.*,
2007 WL 1686966 (C.D. Cal. Feb 27, 2007)....................................................................... 12

*Nail v. Lens.com, Inc.*,
2024 WL 3723912 (C.D. Cal. June 20, 2024) ....................................................................... 6

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014)..................................................................................... 2, 9, 10

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025)............................................................................................. 16

*Prang v. Los Angeles Cnty. Assessment Appeals Bd.*,
15 Cal. 5th 1152 (2024) ..................................................................................................... 21

*R.C. v. Sussex Publishers, LLC*,
2025 WL 948060 (N.D. Cal. Mar. 28, 2025)....................................................................... 18

*Rainey v. A Place for Rover, Inc.*,
2022 WL 16942849 (C.D. Cal. July 18, 2022) .............................................................. 6, 7

*Ramirez v. Trusper Inc.*,
2025 WL 2955231 (9th Cir. Oct. 20, 2025)........................................................................... 9

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) .......... 25

*Riganian v. LiveRamp Holdings, Inc.*,
2025 WL 2021802 (N.D. Cal. July 18, 2025) .......... 13, 15, 24

*Rocha v. Urban Outfitters, Inc.*,
2024 WL 393486 (N.D. Cal. Feb. 1, 2024) .......... 4, 5

*Rodriguez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025) .......... 1, 21, 22

*Roney v. Miller*,
705 F. App'x 670 (9th Cir. 2017) .......... 25

*Rose v. Variety Media, LLC*,
2025 WL 2794920 (Super. Ct. Los Angeles Cnty. Sept. 24, 2025) .......... 1, 21

*Rushing v. Williams-Sonoma, Inc.*,
2025 WL 2391394 (N.D. Cal. Aug. 18, 2025) .......... 4, 6

*Scarlett v. Future US, LLC*,
2025 WL 2614587 (Super. Ct. San Francisco Cnty. Sep. 05, 2025) .......... 1, 20

*Selby v. Sovrn Holdings, Inc.*,
2025 WL 2950164,n.3 (N.D. Cal. Oct. 17, 2025) .......... 16

*Serrano v. Open Rd. Delivery Holdings, Inc.*,
666 F. Supp. 3d 1089 (C.D. Cal. 2023) .......... 4, 7

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) .......... Passim

*Smith v. Maryland*,
442 U.S. 735 (1979) .......... 20

*Specht v. Netscape Communications Corp.*,
306 F.3d 17 (2d Cir. 2002) .......... 10

*Stover v. Experian Holdings, Inc.*,
978 F.3d 1082 (9th Cir. 2020) .......... 11, 12

*TBG Ins. Serv. Corp. v. Super. Ct.*,
96 Cal. App. 4th 443 (2002) .......... 23

*U.S. Dept. of Justice v. Reporters Committee for Freedom of Press*,
489 U.S. 749 (1989) .......... 14, 18

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) ... 20

*United States v. Torres*,
908 F.2d 1417 (9th Cir. 1990) ... 20

*Vincent v. National Debt Relief LLC*,
2024 WL 3344227 (S.D.N.Y. July 8, 2024) ... 10

*Walsh v. Dollar Tree Stores, Inc.*,
2025 WL 2939229 (N.D. Cal. Oct. 16, 2025) ... 10, 18, 23

*Ward v. TheLadders.com, Inc.*,
3 F. Supp. 3d 151 (S.D.N.Y. 2014) ... 12

*Xu v. Reuters News & Media, Inc.*,
2025 WL 3035016 (Super. Ct. Santa Clara Cnty. Oct. 24, 2025) ... Passim

*Xu v. Reuters News & Media Inc.*,
2025 WL 4885091 (S.D.N.Y. Feb. 13, 2025) ... 17

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) ... 9

**STATUTES**

18 U.S.C. § 3127(3) ... 20

Cal. Civ. Code § 1798.100(a) ... 23

Cal. Pen. Code § 637.2 ... 25

Cal. Pen. Code § 638.50 ... 19

Plaintiff Trevor Harris ("Harris") respectfully submits this Opposition to Defendant iHeart Media, Inc.'s ("Defendant") Motion to Transfer, Compel Arbitration, or Dismiss the Class Action Complaint (ECF No. 18) (the "Motion" or "Mtn.").

**INTRODUCTION**

Harris alleges that Defendant installed Trackers[1] on his and other Website users' browsers, which Defendant and the Third Parties used to de-anonymize and identify Harris and other Website users by linking them to profiles, and to sell their information to advertisers, without Harris's and other Website users' consent. *See*, *e.g.*, Compl. ¶¶ 2-3, 6, 206-210, 216-217, 235-236. Because the Trackers are devices or processes that record and decode routing, addressing, or signaling information—users' IP addresses, Device Metadata, and unique user identifiers—they constitute "pen registers" under CIPA § 638.50(b), which Defendant installed and used without consent or a court order in violation of CIPA § 638.51. *See*, *e.g.*, Compl. ¶¶ 59, 95-98, 113-116, 136-139.

"Several judges in this [D]istrict, including Judges Lin, Orrick, Pitts, Ryu, Tigar, and [Breyer], have held that such allegations suffice at the pleading stage" to state a violation of CIPA § 638.51. *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *2 (N.D. Cal. Oct. 9, 2025) (collecting cases). So too have federal courts at large. *See*, *e.g.*, *Moody v. C2 Educational Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. 2024); *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921 (C.D. Cal. 2025); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33 (S.D.N.Y. 2025). And so too have more recent Superior Court decisions. *Scarlett v. Future US, LLC*, 2025 WL 2614587, at *4 (Super. Ct. San Francisco Cnty. Sep. 05, 2025); *Rose v. Variety Media, LLC*, 2025 WL 2794920, at *2-3 (Super. Ct. Los Angeles Cnty. Sept. 24, 2025); *Xu v. Reuters News & Media, Inc.*, 2025 WL 3035016, at *3-4 (Super. Ct. Santa Clara Cnty. Oct. 24, 2025). Defendant's 12(b)(6) arguments—"a copycat of many others filed by" defense counsel in these cases (MTD at 1:2-3)—should be rejected by this Court as they have been in these other decisions. The same is true of Defendant's bid to dismiss this case for lack of Article III standing. *See*, *e.g.*, *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at *4 n.4 (N.D. Cal. Sept. 4, 2025).

[1] All terms not defined herein shall have the same meaning as in the Complaint. ECF No. 1.

Defendant's arguments in favor of transfer and arbitration fare no better. The Ninth Circuit and this Court have made clear that "[a] web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text." *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022); *see also Edwards v. MUBI, Inc.*, 773 F. Supp. 3d 868, 882-83 (N.D. Cal. 2025) (Lee, J.). And the Ninth Circuit and this Court have made clear that "[a] user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1158 (9th Cir. 2025); *Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 767 (N.D. Cal. 2025) (Lee, J.). The design and content of Defendant's account creation screen fails on both fronts. Rowe Decl. Ex. A.

For the following reasons, Defendant's Motion should be denied.

## ARGUMENT

### I. DEFENDANT'S MOTION TO COMPEL ARBITRATION MUST BE DENIED BECAUSE DEFENDANT HAS NOT MET ITS BURDEN TO SHOW HARRIS'S NOTICE OF OR UNAMBIGUOUS ASSENT TO THE 2024

Defendant argues that Harris agreed to arbitrate his claims because "iHeart's account creation flow put Plaintiff on inquiry notice of the 2024 Terms" and "Plaintiff unambiguously manifested assent to the 2024 Terms by clicking the 'Google' button." Mtn. at 8:12, 8:26-27. Not so.

As an initial matter, although the 2024 terms include a New York choice of law provision (Rowe Decl. Ex. B § 25), California law controls whether Harris had notice of and assented to the 2024 terms because the question here is whether a contract was formed in the first place. *Crano v. Sojern, Inc.*, 2025 WL 2689267, at *3 (N.D. Cal. Sept. 19, 2025) (applying "California law to the contract formation question" "despite the New York choice of law provision."). Regardless, "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) (cleaned up); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) ("[B]oth California and New York law dictate the same outcome."). Indeed, the Ninth Circuit has emphasized that "no differences exist in the law of the different states as to internet contract

formation." *Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025). Thus, the outcome will be the same regardless of what state's law applies.

Moving on, "an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action … that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 857. "Under California law and generally applicable principles of contract law, the burden is on [Defendant] as the party seeking arbitration to show that it provided notice of [the] TO[U] and that there was mutual assent to the contractual agreement to arbitrate." *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023). Defendant has not met its burden.

### A. Defendant Has Not Met Its Burden To Show Harris Was On Notice Of Defendant's 2024 Terms

#### *1. The Design And Content Of The Account Creation Page Have Multiple Indicia Of Inconspicuousness*

Defendant's account creation screen as it "would have existed on the Website on December 1, 2024" appeared as follows:




Rowe Decl. ¶ 5; *id.* Ex. A. This page contains many hallmarks that California courts, including this Court, have found render the Terms of Use hyperlink too inconspicuous for notice.

*First*, the Terms of Use hyperlink is in "a tiny [] font considerably smaller than the font used in the surrounding website elements," and is solely distinguished by its underlining. *Berman*, 30 F.4th at 856. But "[s]imply underscoring words or phrases, as in the webpage[] at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists." *Id.* at 857; *Edwards*, 773 F. Supp. 3d at 882-83 (finding no notice where "[t]he underlined phrases … are hyperlinks, but they appear in the same tiny white font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink") (cleaned up); *Rocha v. Urban Outfitters, Inc.*, 2024 WL 393486, at *4 (N.D. Cal. Feb. 1, 2024) (same where "the hyperlinks' sole distinguishing feature is an underline.") (cleaned up); *Rushing v. Williams-Sonoma, Inc.*, 2025 WL 2391394, at *7 (N.D. Cal. Aug. 18, 2025) (same where "[t]he disclaimer is in small font … is the same color as surrounding text, the terms and conditions are not capitalized, and while underlined, the hyperlink represented by the underlining is not in blue or otherwise color contrasted.") *Serrano v. Open Rd. Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089, 1096 (C.D. Cal. 2023) ("[T]he failure to identify the hyperlink to Defendant's Terms of Use by more than mere underlining is highly significant under *Berman*.").

This concern is exacerbated by other elements of the page. For instance, the "Log In" text is also a hyperlink, but it is also in blue font (and much larger than the Terms of Use hyperlink). Rowe Decl. Ex. A. And the hyperlink's font color is in the same "gray font is also used for other elements of the Sign-Up Page that do not appear to be hyperlinks." *Lee*, 773 F. Supp. 3d at 766. Indeed, "the color of the advisal text blends into the background and is displayed in a lighter color than other text on the page." *Godun*, 135 F.4th at 711.

*Second*, as Defendant concedes, Harris created his account by clicking the "connect with Google" option. Rowe Decl. ¶ 7. But the hyperlink was placed "far below the '[Google]' button that Plaintiff clicked on to create his account." *Lee*, 773 F. Supp. 3d at 766. Under Ninth Circuit precedent, that also renders the hyperlink inconspicuous. *Godun*, 135 F.4th at 712 (hyperlink inconspicuous where advisal was not "located directly above or below the action button and is displayed in relatively small text"); *Chabolla*, 129 F.4th at 1157 ("A reasonably prudent user would likely click 'Continue' and read no further if she had no intention of using Facebook."); *Edwards*,

773 F. Supp. 3d at 883 (finding no notice where "clicking on the prominent 'GET STARTED' button at the top would automatically direct them to the page where they can start the trial"). This lack of notice is again exacerbated by the "two-column webpage," in which the Google button appears in a separate column from the Terms of Use hyperlink, and far above it. *See Cruz v. Tapestry, Inc.*, 113 Cal. App. 5th 943, 919 (2d Dist. 2025).

*Third*, even as to those who clicked the standard "Sign Up" button, that too is insufficient for notice. Even though the advisal is "just [above] the action button," "other aspects of the notice text and the action button deemphasize the conspicuousness of the notice text." *Cruz*, 133 Cal. App. 5th at 918. Specifically, there are multiple form fields with much larger text, a much larger checkbox that users can click to "receive email updates" (again, in much larger text), the larger "sign up" button, the Google and Facebook options, and even the "Log In" hyperlink in blue text. Rowe Decl. Ex. A. This leaves the hyperlink "sandwiched between other larger elements" "that [are] more likely to draw a consumer's attention." *Rocha*, 2024 WL 393486, at *5; *see also Berman*, 30 F.4th at 857 (finding no notice of hyperlink, even though it was above the action button, where "[t]he comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else" and "other visual elements draw the user's attention away" from the hyperlink). So, as the California Court of Appeal recently held:

> the notice text is approximately half the size of the text in the fields for information to be entered in the check-out page for delivery orders. Significantly, the labels for these fields appear in a graphic comprised of several boxes, and [Defendant] acknowledge[s] the transaction cannot be completed unless the consumer provides the information requested in those fields.
>
> Whereas [Defendant] ha[s] utilized a graphical interface to ensure a consumer supplies billing information, they have not done the same to alert a consumer to the Terms of Use (e.g., by requiring a consumer to check a box next to the notice text).

*Cruz*, 113 Cal. App. 5th 919. For each of these reasons, Defendant cannot show that Harris or other Website users were on notice of the hyperlink to the Terms of Use.

### 2. *Defendant's Arguments And Authorities Are Unpersuasive*

Defendant argues "[t]he full context of these screens put Plaintiff on notice that he was entering into a continuing, forward-looking relationship governed by terms and conditions." Mtn. at

8:15-17 (cleaned up). This is wrong. As this Court has held in analogous circumstances, Harris "created an account to use [Defendant's] [] service, but he did not enter into a paid membership plan that involved ongoing transactions – or even a single paid transaction." *Lee*, 773 F. Supp. 3d at 765 (cleaned up). Indeed, "Plaintiff was able to sign up for [Defendant's] service by clicking just one button and continuing through his [Google] account; he was not required to provide payment information, and the relationship did not contemplate any future purchases that would be bound by terms." *Id.* at 765-66 (cleaned up). "Thus, although Plaintiff and [Defendant] had a continuing relationship in that Plaintiff was free to continue using [Defendant's] service, Plaintiff had no reason to look for additional terms and conditions not explicitly listed on [Defendant's] website." *Id.* at 765 (cleaned up); *see also Cruz*, 113 Cal. App. 5th at 916 ("An online purchase of merchandise does not necessarily give rise to a consumer expectation of an ongoing relationship governed by extensive contractual terms."). In any event, even if the context of the transaction weighed in favor of notice (and it does not), "[c]ourts must still evaluate the visual aspects of the notice under the two-part test we articulated in *Berman*." *Keebaugh v. Warner Bros. Entertainment Inc.*, 100 F.4th 1005, 1019 (9th Cir. 2024). And the visual aspects do not suffice.

Defendant also hangs its hat on three cases to support notice: *Nail v. Lens.com, Inc.*, 2024 WL 3723912 (C.D. Cal. June 20, 2024); *Rainey v. A Place for Rover, Inc.*, 2022 WL 16942849 (C.D. Cal. July 18, 2022); and *L.W.A. v. LinkedIn Corp.*, 2025 WL 2780788 (N.D. Cal. Sept. 30, 2025). Each is distinguishable or is otherwise easily disposed of. *Nail* has been criticized by courts in this District as "not follow[ing] the significant holdings of the Ninth Circuit cases on which [it] rel[ies]." *Rushing*, 2025 WL 2391394, at *7 n.10. Indeed, the California Court of Appeal has held *Nail* is no longer good law in other respects. *See Cruz*, 113 Cal. App. 5th at 917 ("Insofar as *Nail* may be read to hold that the online purchase of a product always gives rise to a continuing relationship … we respectfully disagree.").

As for *Rainey*, it not only predates *Godun*, *Chabolla*, and *Cruz*, *Rainey* failed to cite to, consider, or even distinguish *Berman*, which was issued several months prior. *See generally Rainey*, 2022 WL 16942849. Indeed, *Rainey* seems in conflict with a core holding in *Chabolla*: that when the advisal language is significantly below the button a user would be required to click on, that is

insufficient for notice. *Compare* MTD at 7 (showing screenshot of webpage from *Rainey* in which advisal is well below the "Continue with Facebook [or Google or Apple]" buttons); *with Chabolla*, 129 F.4th at 1157 ("A reasonably prudent user would likely click 'Continue' and read no further if she had no intention of using Facebook."). And "*Berman* [and *Chabolla* and *Godun* and *Cruz*], of course, [are] binding precedent, while [*Rainey*] is not." *Serrano*, 666 F. Supp. 3d at 1097 n.1. In any event, unlike here, the hyperlink in *Rainey* was colored blue rather than merely underlined, and the webpage was much less cluttered (no two-column layout and no form fields or checkboxes, only several buttons). In addition, unlike here, the transaction gave rise to an ongoing relationship because the plaintiff was arguably an employee of the defendant. *See Rainey*, 2022 WL 16942849, at *1 ("Plaintiff's claims center around allegations that she and other service providers that used Rover were misclassified as independent contractors, rather than employees.").

Last, *L.W.A.* did not cite to, consider, or otherwise reference *Godun*, *Chabolla*, or *Cruz* (each of which were issued several months prior). *See generally L.W.A.*, 2025 WL 2780788. And again, *Godun*, *Chabolla*, and *Cruz* are binding; *L.W.A.* is not. Regardless, unlike here, the screen in *L.W.A.* was "free from clutter." *L.W.A.*, 2025 WL 2780788, at *1, *4. The screen had far fewer form fields and buttons than here, the hyperlink was not sandwiched between more conspicuous elements like a checkbox for e-mails, and there was no two-column layout. *Id*. But again, this Court must follow *Godun*, *Chabolla*, and *Cruz*'s interpretation of California law, not *L.W.A.*'s.

Thus, Defendant cannot show Harris was on notice of the Terms of Use hyperlink.

### B. Defendant Has Not Met Its Burden To Show Harris Unambiguously Assented To Defendant's 2024 Terms

Defendant also argues "Plaintiff unambiguously manifested assent to the 2024 Terms by clicking the 'Google' button, which was a required step in creating his iHeart account and synced with the language in iHeart's notice." Mtn. at 8:26-28. This is not correct.

As the Ninth Circuit has made clear, "[a] user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. "Even strongly implicit advisement isn't enough—a webpage must explain that certain actions will be

understood by the offeror to signal assent to contractual terms. And it must identify what, exactly, those actions are." *Godun*, 135 F.4th at 711 (cleaned up).

Defendant's account creation screen does not meet this standard. The advisal states that "[b]y *creating an account*, you also agree to our Terms of Use." Rowe Decl. Ex. A (emphasis added). But the button Harris clicked states "*connect with*" Google. *Id.* (emphasis added). And a user is not creating an iHeart account by clicking the Google button, nor does the advisal state a user agrees to any terms by "connecting" with Google. Indeed, Defendant admits that connecting with Google is not the same as creating an iHeart account, noting the user is merely using their pre-existing Google account to "sign in to iHeartRadio." Rowe Decl. Ex. A. "[T]he resulting ambiguity is dispositive." *Chabolla*, 129 F.4th at 1158 (finding no assent where "Screen 2 explains that by signing up you agree to our Terms of Use and Privacy Policy. There is no sign up button, and the only button on screen 2 reads Continue.") (cleaned up); *Lee*, 773 F. Supp. 3d at 767 ("[T]his language is ambiguous because it describes two actions that constitute assent, but neither matches the 'Continue with Facebook' button that Plaintiff clicked."); *Godun*, 135 F.4th at 711 ("Even strongly implicit advisement isn't enough…"). Contrast that to the explicit language in *Rainey*, which stated, "By signing in or signing up, I agree to Rover.com's Terms of Service." MTD at 7. In any event, to the extent *Rainey* conflicts with the Ninth Circuit's later decision in *Chabolla*, *Chabolla* controls.

Nor does the language on subsequent screens suffice for assent. Rowe Decl. Ex. A. Even assuming *arguendo* that users have notice of the hyperlinks on the subsequent screens, the advisal on these subsequent screens tells users they can "*review* iHeartRadio's … terms of service." *Id.* (emphasis added). As in *Berman*, *Chabolla*, and *Godun*, there is no language that would "indicate to the user what action would constitute assent to those terms and conditions." *Berman*, 30 F.4th at 858 (advisal stated "I understand and agree to the Terms & Conditions" without linkage to a button); *Chabolla*, 129 F.4th at 1159 ("[S]creen 3 fails to tell the user the significance of clicking 'Redeem now,' and therefore fails to provide the opportunity to unambiguously manifest assent to the Terms of Use."); *Godun*, 135 F.4th at 712 ("The advisal lacked an explanatory phrase indicating that 'By clicking connect now' … etc., she agreed to the terms."); *Lee*, 773 F. Supp. 3d at 767 ("The phrase 'Plex's Privacy Policy and Terms of Service' appears beneath this notice, but nothing connects these

terms to any action that the user takes on the Facebook UserFlow."); *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1077 (C.D. Cal. 2021) ("Lululemon did not ask Yoon to agree to the Privacy Policy; rather, Lululemon instructed Yoon that she could 'learn more' about the Privacy Policy when she placed her order.").

Thus, even if Defendant had met its burden to show notice of the Terms of Use (and it has not) Defendant has failed to meet its burden to show unambiguous manifestation of assent to the same. Accordingly, Defendant cannot compel arbitration of Harris's claims.

## II. DEFENDANT'S MOTION TO TRANSFER MUST BE DENIED BECAUSE DEFENDANT HAS NOT MET ITS BURDEN TO SHOW HARRIS'S NOTICE OF OR UNAMBIGUOUS ASSENT TO THE 2025 TERMS

Defendant also contends that Harris "agreed to the 2025 Terms"—which contain a forum-selection clause—because Defendant "post[ed] them to the Website on March 12, 2025." Mtn. at 9:7-8. Where? Defendant has failed to include *anything* about the design and content of its Website on this date, indicating that Harris would have been made aware of the Terms of Use hyperlink and consented to the new terms. Defendant's failure to submit evidence of the design and content of the Website where Harris ostensibly would have seen the updated terms is fatal to Defendant's argument under Ninth Circuit law. *See*, *e.g.*, *Jackson*, 65 F.4th at 1099 (declining to enforce updated terms where "Amazon did not provide the court with a copy or description of any such notice, however. Nor did Amazon make any showing that Jackson received such notice."); *Ramirez v. Trusper Inc.*, 2025 WL 2955231, at *2 (9th Cir. Oct. 20, 2025) (declining to enforce arbitration clause where the defendant "did not provide a screenshot of the table of contents page").

To the extent Defendant is arguing that there is a hyperlink at the very bottom of its Website that links to the updated terms, that is a quintessential browsewrap agreement that is unenforceable under the law of this Circuit and others. *See*, *e.g.*, *Nguyen*, 763 F.3d at 1177 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement."); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009), *aff'd*, 380 F. App'x 22 (2d Cir. 2010) (declining to enforce arbitration provision where the plaintiff "could not

even see the link to [the terms and conditions] without scrolling down to the bottom of the screen"); *Vincent v. National Debt Relief LLC*, 2024 WL 3344227, at *3 (S.D.N.Y. July 8, 2024) (same).

Defendant argues that "Plaintiff manifested assent to the 2025 Terms because he visited the Website on April 10, 2025, logging in and using the site." Mtn. at 9:17-18. The Ninth Circuit disagrees. Merely using a website is not enough for assent without "actual or constructive knowledge of a website's terms and conditions." *Nguyen*, 763 F.3d at 1176; *see also Walsh v. Dollar Tree Stores, Inc.*, 2025 WL 2939229, at *5 (N.D. Cal. Oct. 16, 2025) (noting "[c]ourts are generally reluctant to enforce" agreements where "a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website") (cleaned up). And notably, the "Log In" page for Defendant's Website does *not* contain a hyperlink to the Terms of Use, or language stating a user agrees to the Terms of Use by logging in.




Rowe Decl. Ex. A. Accordingly, Defendant has not shown that Harris assented to the updated terms when he connected with his Google account to access Defendant's services in 2025.

In an attempt to skirt its evidentiary burden, Defendant argues that it provided notice of the updated terms "[c]onsistent with Section 2 of the 2024 Terms." Mtn. at 9:7. Of course, Defendant has not demonstrated that Harris was on notice of or assented to the 2024 terms in the first place. Argument §§ I.A-I.B, *supra*. Regardless, section 2 of the 2024 terms states that "iHeartMedia will provide notice of [] change[s] on this iHeartMedia Site." Rowe Decl. Ex. B § 2. But as noted above, Defendant has not shown where or how it provided notice of the updated terms on the Website. And simply including an inconspicuous hyperlink "buried at the bottom of the page" does not suffice for notice. *Nguyen*, 763 F.3d at 1177; *see also Specht v. Netscape Communications Corp.*, 306 F.3d 17,

32 (2d Cir. 2002) (Sotomayor, J.) ("[T]here is no reason to assume that viewers will scroll down to subsequent screens simply because screens are there."). This is dispositive. *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1085-86 (9th Cir. 2020) ("[W]e are asked whether a single website visit four years after assent to a contract containing a change-of-terms provision is enough to bind the parties to terms in the then-current version of the contract of which the visitor is unaware. We answer in the negative.").

Nor was the obligation on Harris to check for updates to the terms—especially where, as here, Harris did not have notice of or assent to the 2024 terms in the first place. Argument §§ I.A-I.B, *supra*. At a high level, the Ninth Circuit has held that "[r]epeated use of a website … does not contribute to constructive notice because users are no more likely to stumble upon inconspicuous hyperlinks on their hundredth or thousandth visit than they are on their first." *Benson v. Double Down Interactive, LLC*, 798 F. App'x 117, 119-20 (9th Cir. 2020). This is so even where there is a change of terms provision. In *Jackson*, 65 F.4th at 1100, the updated terms were "accessible on the Amazon Flex app, and Amazon points to a section in the 2016 TOS stating that by accepting the terms of the agreement Flex drivers were 'responsible for reviewing this Agreement regularly to stay informed of any modifications.'" So, Amazon argued, "the burden was on the Flex drivers to monitor the agreement for changes." *Id*. The Ninth Circuit disagreed, holding "[t]hat assertion stands the law's notice requirement on its head." *Id*. Likewise, in *Stover*, the Ninth Circuit held the plaintiff:

> had no obligation to investigate whether [the defendant] issued new terms without providing notice to her that it had done so. Indeed, *the opposite rule would lead to absurd results*: contract drafters who included a change-of-terms provision would be permitted to bind individuals daily, or even hourly, to subsequent changes in the terms. *The absence of limits on the frequency or substance of changes in terms subverts the basic rule of contract law* that a contract exists where the parties assent to the same thing in the same sense, so that their minds meet.

*Stover*, 978 F.3d. at 1086 (emphasis added; otherwise cleaned up). Thus, the Ninth Circuit held conclusively that "in order for changes in terms to be binding pursuant to a change-of-terms provision in the original contract, *both parties to the contract … must have notice of the change in contract terms*." *Id.* (emphasis added).

Here, Defendant has not provided such notice here for the reasons stated above. And even though the 2024 terms ask users to "[p]lease review this Agreement and/or Additional Terms periodically for changes" (Rowe Delc. Ex. B § 2), this language is noticeably less strong than that in *Jackson*, where users were found "responsible" for reviewing the agreement for modifications. *Jackson*, 65 F.4th at 1100. Yet, as the Ninth Circuit held in *Jackson*—and as should be the case here—the notion users must check the terms frequently for updates stands the law's notice requirement on its head." *Jackson*, 65 F.4th at 1100; *see also Stover*, 978 F.3d at 1086. Thus, Defendant's change-of-terms provision is ineffectual for lack of notice.

Every case Defendant cites predates *Jackson* and *Stover* (or is out-of-circuit), and so is no longer good law to the extent in contradicts the Ninth Circuit's holdings that the obligation is not on users to check for updates to terms absent notice. MTD at 9:9-21 (citing *Matera v. Google Inc.*, 2016 WL 5339806 (N.D. Cal. Sept. 23, 2016); *MySpace, Inc. v. The Globe.com, Inc.*, 2007 WL 1686966 (C.D. Cal. Feb 27, 2007); *DeVries v. Experian Info. Sols., Inc.*, 2017 WL 733096 (N.D. Cal. Feb. 24, 2017); *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151 (S.D.N.Y. 2014)). Moreover, each case is distinguishable. The plaintiff in *DeVries*—which involved the same defendant as *Stover*—argued he was on actual notice of and assented to updated terms, unlike here. *DeVries*, 2017 WL 733096, at *7. The same was true of the plaintiff in *Ward*, 3 F. Supp. 3d at 159. Last, both *Matera v. Google Inc.*, 2016 WL 5339806, at *17 (N.D. Cal. Sept. 23, 2016), and *MySpace, Inc. v. The Globe.com, Inc.*, 2007 WL 1686966, at *10 (C.D. Cal. Feb 27, 2007), appear to directly contradict *Jackson* and *Stover*, finding mere posting of terms to a website is sufficient. In any event, both of those cases included provisions that the terms could be updated by "posting to the website." *Matera*, 2016 WL 5339806, at *17; *MySpace*, 2007 WL 1686966, at *10 ("MySpace.com may modify this Agreement from time to time and such modification shall be effective upon posting by MySpace.com on the Website."). Defendant's language is more circumspect, requiring Defendant to "provide notice" on the Website as opposed to merely posting an update. Rowe Decl. Ex. B § 2.

In sum, Defendant has not met it burden to show Harris notice of or assented to the 2025 terms. Accordingly, Defendant's transfer bid based on the forum selection clause must be denied.

## III. HARRIS HAS BEEN CONCRETELY INJURED BY DEFENDANT'S INSTALLATION AND USE OF THE TRACKERS

### A. Defendant's Installation And Use Of The Trackers Facilitated The Profiling Of Harris And The Widespread Dissemination Of That Profile To Advertisers Without Consent

Defendant argues that "the Complaint must be dismissed on jurisdictional grounds because Plaintiff does not demonstrate a 'concrete' injury sufficient to establish standing under Article III." Mtn. at 12:17-20. Specifically, Defendant frames Harris's harm as the concerning the collection of "IP address and device metadata." Mtn. at 14:9. This takes a myopic view of Plaintiff's allegations, which are more than sufficient to establish standing under Article III. The harm is not just that the Third Parties collected Plaintiff's personal information without consent. The harm is that through the information the Third Parties collect, website users like Harris are identified by being linked to comprehensive, non-anonymous profiles maintained by data brokers; that such linkage occurs by bypassing the normal "restriction that sites can't read each other[s'] cookies"; and that those profiles are offered up for sale to a near endless supply of advertisers without knowledge or consent. *See, e.g.*, Compl. ¶¶ 6, 48-49, 58, 70, 74-75, 81, 86, 91, 93, 132-134, 143, 154-158, 163-170, 173, 178-182, 189, 193, 196, 202, 205, 209, 217.

These "allegations likely satisfy Article III's injury requirement" "because the privacy violation extends beyond the collection of just [Harris's] IP address and metadata; it encompasses how that collection allegedly allowed the third parties to: (1) build a profile reflecting his personal information; and (2) interfere with his ability to remain anonymous." *Deivaprakash*, 2025 WL 2541952, at *4, *4 n.4; *see also*, *e.g.*, *Deivaprakash v. Condé Nast Digital*, 2025 WL 2779193, at *2 (N.D. Cal. Sept. 30, 2025) (finding allegations satisfy "the requirements of *Popa*" where the plaintiff alleged "internet trackers allowed third parties to generate profiles reflecting his personal information"); *Xu*, 2025 WL 3035016, at *3 ("whether Plaintiff has a reasonable expectation of privacy to the collected information does not preclude him from alleging an invasion of privacy injury" because "Plaintiff alleges that the collected information was used to build a profile for users based on their information, interests, and interferences"); *Riganian v. LiveRamp Holdings, Inc.*, --- F. Supp. 3d ---, 2025 WL 2021802, at *6 (N.D. Cal. July 18, 2025) ("[T]he tracking of individuals'

activity across thousands of websites, combined with extensive offline records gathered over decades, to generate uniquely identifying profiles on those individuals is sufficient to allege intrusion into privacy."); *Gabrielli v. Motorola Mobility LLC*, 2025 WL 1939957, at *6 (N.D. Cal. July 14, 2025) ("Gabrielli's allegations that Motorola deprived him control of personal information regarding his digital activity and profile are sufficient to establish a concrete injury to his right to privacy and confer standing."); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (finding Article III standing based on "Oracle's ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers") (cleaned up).

Indeed, Harris alleges that this profiling and tracking occurs regardless of the user's cookie settings. *See*, *e.g.*, Compl. ¶ 103 ("[W]hen Defendant installs TripleLift's Tracker, TripleLift can still track and identify users to sell their information, even if users have purportedly blocked cookies."), ¶ 173. This exacerbates the privacy injury Harris suffered.

In this way, Harris and others lost their right to "control [] information concerning his or her person," which is encompassed within "both the common law and the literal understandings of privacy." *U.S. Dept. of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 763 (1989). This is at least analogous to the tort of intrusion upon seclusion, although an exact match is not required by Ninth Circuit jurisprudence. *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 580 (N.D. Cal. 2025) ("[T]he harm made actionable at common law was an individual's loss of control over her private affairs or concerns by an interloper's tortious intentional interference.") (cleaned up); *In re Accellion, Inc. Data Breach Litig.*, 2025 WL 2799102, at *13 (N.D. Cal. Sept. 30, 2025) ("[T]he Court concludes the better reading of *TransUnion* is that harms need only be similar in kind to those redressed by common law torts. That is because *TransUnion* expressly rejected the notion that an 'exact duplicate' is required….").

Moreover, Harris's harm is traceable to Defendant's conduct. Defendant is alleged to have "enabled the third parties to amass information about [Harris] by embedding the code in its website[] that surreptitiously installed the trackers on [Harris's] browser in the first place." *Deivaprakash*, 2025 WL 2541952, at *4; *Xu*, 2025 WL 3035016, at *3 ("[I]t appears Defendant does not account for Plaintiff's allegation that it was responsible for the installation of the Trackers."); *see*, *e.g.*,

Compl. ¶¶ 24, 26, 55-56, 63, 71, 76, 88, 102, 120, 128, 207. Indeed, the Third Parties' tracking was not only done at Defendant's direction, but for Defendant's financial benefit as well (*i.e.*, advertising revenue). *See*, *e.g.*, Compl. ¶¶ 153, 157-158, 164, 166, 179-182. And the harm that befell Harris here—the linkage to non-anonymous profiles and the continued building of the same, the sale of those profiles to unlimited numbers of advertisers—occurred directly on Defendant's Website. *See*, *e.g.*, *id.* ¶¶ 156, 158, 207-209, 216-217. Defendant's "knowing participation in this scheme … is enough to confer standing for a victim of the scheme to sue [Defendant] in federal court." *McClung v. AddShopper, Inc.*, 2024 WL 189006, at *2 (N.D. Cal. Jan. 17, 2024). Thus, by facilitating the creation and widespread sale of profiles through its installation and use of the Trackers, Defendant caused Harris to suffer a concrete privacy harm.

### B. Defendant Was Unjustly Enriched Through Its Installation And Use Of The Trackers

As another ground for statutory standing, Harris alleges that Defendant derived an unlawful economic benefit through its installation and use of the Trackers. Specifically, Harris alleges that by installing and using the Trackers, Plaintiff's information was collected by the Third Parties without consent; the Trackers de-anonymized Harris, which enabled his information to be sold to advertisers for a higher value than it otherwise would have been; and that Defendant derived a profit from these unlawful sales. Compl. ¶ 180 ("[T]he Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Websites (e.g., IP addresses, Device Metadata, unique IDs) with comprehensive user profiles."); *see also*, *e.g.*, *id.* ¶¶ 5, 75, 82, 87, 93, 127, 134, 153-156, 163-166, 179-182, 189, 192, 196, 205, 208-209, 217. Indeed, Harris includes allegations showing his information was bid on by at least one advertiser on the Website, who he alleges bid more than it otherwise would have because of Harris's linkage to comprehensive profiles vis-à-vis the Trackers. *Id.* ¶¶ 165-166, 179-180, 209, 217.

This also suffices for injury. *See*, *e.g.*, *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1038 (S.D. Cal. 2023) (Article III standing alleged where "Plaintiff … conferred a benefit on Defendant through the use and dissemination of Plaintiff's … personal information … which Defendant used and disseminated for its own monetary benefit.") (cleaned up); *Riganian*, 2025 WL

2021802, at *13 (sustaining unjust enrichment claim based on "allegations as to how LiveRamp has violated Plaintiffs' privacy rights to create a 'surveillance ecosystem' at the heart of its revenue generation without their consent"); *In re Google RTB Consumer Privacy Litig.*, 606 F. Supp. 3d 935, 941, 943 (N.D. Cal. 2022) (finding Article III standing where "[t]hrough RTB, Google solicits participants to bid on sending an ad to a specific individual" and "Google provides highly specific information about the target in the bid request … including data that identifies the individual being targeted through unique identifiers, device identifiers, geolocation, IP address, cookie match, and other information").

**C. Defendant's Arguments And Authorities Are Unpersuasive**

None of the aforementioned arguments are affected by *Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. 2025), which did not disturb pre-existing Article III standing jurisprudence. *See Dellasala v. Samba TV, Inc.*, 2025 WL 3034069, at *2 (N.D. Cal. Oct. 30, 2025) ("*Popa* did not set forth a new rule of law…"). Moreover, "[t]he scope of the alleged tracking in this case is materially more invasive than the limited tracking at issue in" *Popa*. *Selby v. Sovrn Holdings, Inc.*, 2025 WL 2950164, at *3 n.3 (N.D. Cal. Oct. 17, 2025). *Popa* involved "the tracking of plaintiff's non-sensitive interactions with a single website." *Id.* Although Defendant emphasizes that "over 30 different categories of website visitors' information" were allegedly recorded in *Popa* (Mtn. at 13:21-22), all this information was anonymous because the website had configured the third party software to exclude the user's "street number and zip code." *Popa*, 153 F.4th at 787, 787 n.1. Moreover, the only thing the third party did with the information in *Popa* was tell websites "which elements of a website have high user engagement, how far website users scrolled on the website, and the total clicks within a given area on the website." *Id.* at 786 (cleaned up). So, *Popa* boiled down to a third party collecting anonymous information that was used in a manner akin to "a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems that disrupt potential sales." *Id.* at 791. Unlike here, there was no linkage of information to non-anonymous profiles maintained by data brokers, no sale of that information to advertisers, and no loss of control of personal information because personal information was not captured in *Popa*.

Defendant's other authorities do not move the needle. Defendant cites *Kishnani v. Royal Caribbean Cruises Ltd.*, 2025 WL 1745726 (N.D. Cal. June 24, 2025), and *Mitchener v. CuriousityStream, Inc.*, 2025 WL 2272413 (N.D. Cal. Aug. 6, 2025). But those cases did not involve "the creation of a detailed profile and [the plaintiff's] reduced capacity to remain anonymous." *Deivaprakash*, 2025 WL 2541952, at *4 (distinguishing *Mitchener*, which concerned "substantively identical" allegations to *Kishnani* (*Mitchener*, 2025 WL 2272413, at *2)). Indeed, although the plaintiffs in *Mitchener* and *Kishnani* alleged the defendants "*could* gain additional information about a visitor such as name, date of birth, and address," the plaintiffs failed to allege those pieces of information were disclosed as to them. *Mitchener*, 2025 WL 2272413, at *5 (emphasis in original; otherwise cleaned up). By contrast, Harris alleges his specific information was linked to non-anonymous profiles that were then sold to advertisers on his visit to the Website. *See*, *e.g.*, Compl. ¶¶ 207-209, 217. These same allegations distinguish this case from *Khamooshi v. Politico LLC*, 2025 WL 2822879, at *2 (N.D. Cal. Oct. 2, 2025), which concerned the disclosure of various types of information like "geolocation data, device type, browser type, and 'device fingerprints,'" but again without linkage to comprehensive profiles that were sold to advertisers.

Defendant also claims *Xu v. Reuters News & Media Inc.*, 2025 WL 4885091 (S.D.N.Y. Feb. 13, 2025), "evaluated effectively the same allegations and claims at issue here." Mtn. at 15:26-27. As even a precursory review of the federal *Xu* complaint shows, this is flat out false. The federal *Xu* complaint, unlike here, involved only the collection IP addresses, without linkage to profiles or allegations about data brokers or real-time bidding. *Xu*, 2025 WL 488501, at *5 ("The Complaint does not allege that Reuters collected, from Xu … any information other than the IP address of the device used by Xu to visit the Website.") (cleaned up). Upon refiling in state court, the *Xu* plaintiff made allegations like those here that "the collected information was used to build a profile for users based on their information, interests, and interferences." *Xu*, 2025 WL 3035016, at *3. And whereas in the federal *Xu* case, the plaintiff was "not alleged to have received such a targeted advertisement or otherwise exposed to marketing" (*Xu*, 2025 WL 488501, at *2), Harris here shows his information was bid on by advertisers based on his linked profile. *See*, *e.g.*, Compl. ¶¶ 208-209, 216-217. *Gabrielli v. Insider, Inc.*, 2025 WL 522515 (S.D.N.Y. Feb. 18, 2025), is akin to the federal *Xu*

complaint rather than this case, and is inapposite for that reason. *See also Walsh*, 2025 WL 2939229, at *10 n.4 (disagreeing with *Insider*).

Defendant also relies on cases evaluating a user's expectation of privacy in their IP address under the Fourth Amendment. Mtn. at 16:25-17:5. As noted above, this takes an overly narrow view of Harris's allegations, which concern the profiling of Harris and other users by the Third Parties using the information that Defendant enables the Third Parties to collect based on the installation and use of the Trackers. Argument § III.A, *supra*. In any event, there is no "categorical" rule that users have no expectation of privacy in their IP addresses under the Fourth Amendment. *See R.C. v. Sussex Publishers, LLC*, 2025 WL 948060, at *3 (N.D. Cal. Mar. 28, 2025). And "the question whether a tort action might lie for invasion of privacy" is the not the same as "whether an individual's interest in privacy is protected by the Constitution." *Reporters Committee*, 489 U.S. at 762 n.13; *see also Lesh*, 767 F. Supp. 3d at 39 ("[C]ases regarding the limits of the Fourth Amendment have no bearing on whether an individual has standing to sue under CIPA, as CIPA provides protection beyond the floor set by the Fourth Amendment.").

Last, Defendant relies on *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182 (N.D. Cal. 2020), and *Carolus v. Nexstar Media Inc.*, 2025 WL 1338193, at *1 (N.D. Cal. Apr. 9, 2025). In *Heeger*, the plaintiff "allege[d] only that Facebook collected plaintiffs' IP addresses and even then, *only when they were using the Facebook app or were visiting Facebook's website*." *Heeger*, 509 F. Supp. 3d at 1188 (emphasis added). In other words, *Heeger* involved a situation where the disclosures were made by one party to the communication to another. *Id*. By contrast, Harris here alleges "that the collection of [his] IP address[] through the Trackers allows the *third parties* to obtain 'personally identifying, non-anonymized information.'" *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 932 (N.D. Cal. 2024) (emphasis added). And in *Carolus*, 2025 WL 1338193, at *1, again unlike here, "the plaintiffs allege[d] that IP addresses only disclose the fact that a given device visited The Hill's website and the general location of that device." There were again no allegations of linkage to non-anonymous profiles or their sale to advertisers. Indeed, the *Carolus* court distinguished the allegations before it from those like here, which involve the "disclosure of several types of personal information all linked together, not just IP addresses." *Id*.

## IV. HARRIS HAS SUFFICIENTLY PLED A CIPA § 638.51 CLAIM UNDER THE PREVAILING LAW OF THIS DISTRICT

### A. Under The Plain Text Of The Statute And Caselaw, The Trackers Record "Routing, Addressing, Or Signaling Information" Transmitted By Harris's Computer

Defendant argues that the Trackers are not "pen registers" because they "collect information about the *source* of communications made to the Website (*i.e.*, his device), rather than the outgoing dialing, routing, addressing, or signaling information sent *from that source*." Mtn. at 18:9-11 (emphasis in original). On the contrary, Harris has alleged outgoing information—his IP address, Device Metadata, and unique user identifiers—transmitted from his computer via an HTTP request, just as the statute requires. *See*, *e.g.*, Compl. ¶¶ 24-26, 63-64, 97, 102-103, 115, 120-121, 138; *see also* Cal. Pen. Code § 638.50(b) (defining a "pen register," in relevant part, as "a device or process that records or decodes … information *transmitted by* an instrument or facility *from which* a wire or electronic communication is transmitted") (emphasis added); *Shah*, 754 F. Supp. 3d at 930 (trackers were pen registers where they recorded "addressing information transmitted by the user's computer … in connection with the outgoing HTTP request to [the defendant's] website").

In any event, Defendant is wrong that a "pen register" cannot record information related to the "source" of the communication. Mtn. at 22:26-19. And Defendant mispresents that no federal court has addressed "the core mismatch between the theory pleaded here and the definition of a 'pen register' provided in Section 638.50." *Id.* at 22:26-27. In *Shah*, the court addressed Defendant's exact argument here: that the trackers were not "pen registers" because they did "not collect any '*recipient* 'dialing, routing, addressing or signaling information' relating to an outgoing communication,' but instead collect the *sender's* IP address. *Shah*, 754 F. Supp. 3d at 929 (emphasis in original). The *Shah* court rejected this argument because "[n]othing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Id.* And because the statutory definition "is clear," the analysis "must end there." *Id*. Thus, *Shah* found web trackers are "pen registers" if they "record addressing information transmitted by the user's computer … in connection with the outgoing HTTP request to [a] website, regardless of whether that addressing information pertains to the sender or the recipient of the communication at issue." *Id.*

Numerous federal courts have evaluated *Shah*'s reasoning. Every single one has agreed with it. *See*, *e.g.*, *Fregosa*, 2025 WL 2886399, at *7 (discussing *Shah* and holding trackers were "pen registers" where they recorded "the user's IP address and other routing data"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *4 (N.D. Cal. Dec. 12, 2024) (same where "the instruments or facilities are users' computers or smartphones" and "the Trackers record the addressing information by instructing the user's browser to send the user's IP address to the Tracker") (cleaned up); *Lesh*, 767 F. Supp. 3d at 40-41 (same); *Garon v. Keleops USA, Inc.*, 2025 WL 2522374, at *4 (N.D. Cal. Sept. 2, 2025). So too have recent state court decisions. *Scarlett*, 2025 WL 2614587, at *4 (following *Shah*); *Xu*, 2025 WL 3035016, at *4 (same).

Ignoring the plain statutory text, Defendant cites to inapposite caselaw. *Smith v. Maryland*, 442 U.S. 735 (1979), for instance, was decided before the enactment of the Federal Pen Register Act in 1986, let alone the CIPA's pen register provision in 2015 or "before the internet became prevalent." *Garon*, 2025 WL 2522374, at *5. Several of Defendant's cases discussed the pre-2001 version of the Federal Pen Register Act. *See*, *e.g.*, *United States v. Torres*, 908 F.2d 1417, 1420 (9th Cir. 1990); *United States v. Forrester*, 512 F.3d 500, 512 (9th Cir. 2008) (surveillance "took place in May-July 2001," before amendment). The then-applicable definition of a "pen register" was a "device which records or decodes electronic or other impulses which identify the *numbers dialed* or otherwise transmitted *on the telephone line* to which such device is attached." 18 U.S.C. § 3127(3) (as enacted Oct. 21, 1986) (emphasis added). Under that definition, a pen register could record only information related to who a person was reaching out to. But the current definition of a "pen register" in the federal act, as well as the CIPA, define the term much more broadly, and without regard to "whether that addressing information pertains to the sender or the recipient of the communication at issue." *Shah*, 754 F. Supp. 3d at 929.

Regardless, to the extent the Federal Pen Register Act imposes a limitation on the definition of a "pen register" that the CIPA does not, the CIPA "broadly defines 'pen register'" and the Court should "not use a similar federal statute so as to read a requirement into the text of a California statute." *Lesh*, 767 F. Supp. 3d at 41; *Moody*, 742 F. Supp. 3d at 1076 (rejecting argument that the CIPA should be limited by the Federal Pen Register Act).

Defendant also cites to *Aviles v. LiveRamp, Inc.*, 2025 WL 487196, at *2 (Super. Ct. Los Angeles Cnty. Jan. 28, 2025), which examined the CIPA and held, "[t]he analog of the number dialed by a telephone here is the IP address and related information of a website accessed by a computer – but not the computer's own IP address or identifying information." *Aviles* based this conclusion on a historical definition of a "pen register," rather than the CIPA's plain text. *Id*. Thus, courts in this District have disregarded *Aviles* and other state court opinions that failed to couch their holdings "on the plain statutory language," unlike the federal authority Harris cites above. *Garon*, 2025 WL 2522374, at *5 (disagreeing with *Aviles* and other cases); *Rose*, 2025 WL 2794920, at *3 (finding several state court opinions unpersuasive because these cases give inadequate weight to the statutory text and structure"). And where, as here, the "statutory text is unambiguous and provides a clear answer, we need go no further." *Prang v. Los Angeles Cnty. Assessment Appeals Bd.*, 15 Cal. 5th 1152, 1180 (2024) (cleaned up).

Last, Defendant contends Harris "was not tracked any more than a … person with an email account tracks individuals who send them messages by receiving their email addresses." Mtn. at 20:9-12 (cleaned up). This soundbite is laughably wrong. Putting aside for a moment that the creation of detailed profiles sold to advertisers is worlds' apart from sending an e-mail, Defendant's hypotheticals concern one party to the communication receiving information from the other party. *Autotrader.com*, 762 F. Supp. 3d at 930 ("[C]ourts have consistently found that the consent exception saves the day, as the recipient is the sole user of the caller ID system, and the recipient consented to its installation and use.").

By contrast, Harris is not alleging that Defendant is liable for its own collection of addressing information, but by installing and using the Trackers, which caused the *Third Parties* to collect that information. *Id.* (sustaining CIPA § 638.51 claim where the plaintiff alleges the "information was sent to third parties, not just Defendant"). So, the more apt hypothetical is having the sending party's e-mail address secretly routed to a third party without consent (who then linked that e-mail address to a profile with comprehensive information and sold that profile to advertisers to enrich the other party to the communication). The Ninth Circuit has recognized such behavior as "eavesdropping" under other provisions of the CIPA. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 608

(9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *see also Shah*, 754 F. Supp. 3d at 932 ("A user who consents to disclose their IP address to Fandom as part of accessing its website does not necessarily consent to disclose their IP address to the third parties operating the Trackers.").

**B. Defendant's Policy Arguments Are Precluded By The Plain Text Of The CIPA, And Are Unpersuasive In Any Event**

Without a textual hook for its position, Defendant resorts to several, effectively, policy-based arguments. But "[t]he Court's task is to interpret the law as the Legislature wrote it." *Shah*, 754 F. Supp. 3d at 932-33. And where, as here, the text of the CIPA "is clear," the Court's analysis "must end there." *Id.* at 929; *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) (noting [t]he text of a law controls over purported legislative intentions unmoored from any statutory text") (cleaned up). Regardless, Defendant's arguments do not stand up to scrutiny.

*First*, Defendant contends "[i]f a website's collection of visitors' IP address violated CIPA … the Internet could not function because a user cannot load or browse a website without transmitting his or his IP address." Mtn. at 20:13-15. For starters, Harris "alleges that the tracking software captured more than just [his] IP address." *Autotrader.com*, 762 F. Supp. 3d at 930. But more important, Defendant's "framing mischaracterizes the" Complaint:

> [Harris] does not allege that [Defendant] violated CIPA simply by receiving IP addresses as part of an ordinary online exchange. Rather, the [Complaint] alleges that [Defendant] affirmatively embedded *third-party trackers* that recorded and transmitted users' identifying information *to outside entities* for profiling and advertising purposes. Courts have rejected similar attempts to dismiss complaints when the allegations involved transmission of data to third parties.

*Fregosa*, 2025 WL 2886399, at *7 (emphasis added); *see also Shah*, 754 F. Supp. 3d at 932 ("A user who consents to disclose their IP address to Fandom as part of accessing its website does not necessarily consent to disclose their IP address to the third parties operating the Trackers."). And, of course, "profiling and advertising" have nothing to do with "operat[ing], maintain[ing], and test[ing] a[n] … electronic communication service." *Motorola Mobility*, 2025 WL 1939957, at *12;

*see also Walsh*, 2025 WL 2939229, at *18 ("'Analytics Cookies' and 'Advertising Cookies' … are not used for billing, communication services, or similar purposes.") (cleaned up).

*Second*, Defendant cites several Superior Court authorities to argue "Section 638.51 did not intend to criminalize the process by which all websites communicate with all users who choose to access them." Mtn. at 22:10-11 (quoting *Garcia v. Diversified Foodservice Supply, LLC*, No. 24STCV19784, Notice of Ruling at *8 (Super. Ct. Los Angeles Cnty. June 24, 2025).[2] Notwithstanding Defendant again misstates Harris's allegations, "to the extent that [Defendant] believes the statute may impose too many burdens when applied to the realities of modern technologies … the question of whether the statute's scope should be narrowed ultimately rests with the Legislature, not the courts." *Shah*, 754 F. Supp. 3d at 933. That being said, all Defendant must do to comply with the CIPA is to procure its users' prior consent to any surveillance. *TBG Ins. Serv. Corp. v. Super. Ct.*, 96 Cal. App. 4th 443, 450 n.5 (2002) ("Zieminski's consent [i]s a complete defense to his invasion of privacy claim."). Indeed, this is something Defendant already should have been doing under the CCPA. Cal. Civ. Code § 1798.100(a) ("A business that controls the collection of a consumer's personal information shall, *at or before the point of collection*, inform consumers of the following…") (emphasis added).

*Finally*, Defendant argues that because the technology at issue in the Complaint "has been commonplace and accepted for decades," but no court or law enforcement agency has "suggested this conduct could constitute an illegal pen register," Harris's theory fails. Mtn. at 23:26-27, 24:15-17.[3] Of course, private plaintiffs cannot sue under the Federal Pen Register Act because it lacks a private right of action, while the CIPA's pen register provision was not enacted until 2015. But the fact that consumers did not think to pursue claims like this until at least 2023 does not mean they lack merit. The CIPA—including its "pen register" provision—"is to be interpreted broadly to protect privacy and to be applied to new techniques and technologies." *Shah*, 754 F. Supp. 3d at

[2] Defendant has not included a copy of any of the state court opinions it cites, nor or many of those opinions available on Westlaw.

[3] The fact that companies have been repeatedly sued over profiling of users and sharing of data, as the cases Defendant cites evidence (Mtn. at 24), shows such conduct has been anything but "accepted" by users.

933. Whether Harris's theory of liability is novel has nothing to do with whether it has merit, and whether others engage in the same conduct as Defendant has nothing to do with whether that conduct is "acceptable" (or that Internet users are aware of or understand it). Profiling users and selling their information without notice or consent is not—or should not be—"how the Internet works." Mtn. at 24:19; *see also*, *e.g.*, *Riganian*, 2025 WL 2021802, at *9 ("[T]his Court is not persuaded that commercially exploiting unlawfully obtained information is 'licit' merely because it is profitable.").

### C. Defendant's Argument Concerning "Downstream" Consequences Is Both Off-Point And A Misnomer

Defendant also argues that any "downstream" use of the information recorded here has "no relevance whatsoever to whether iHeart used a pen register." Mtn. at 23:17-23. Defendant's argument misses the point. The Trackers are "pen registers" because they collect "routing, addressing, or signaling information"—users' "IP address, Device Metadata, and unique user IDs"—"transmitted by the user's computer … in connection with the outgoing HTTP request to [Defendant's] website." *Shah*, 754 F. Supp. 3d at 929; *see*, *e.g.*, Compl. ¶¶ 24-26, 63-64, 97, 102-103, 115, 120-121, 138. Defendant used the "pen registers" because it "deliberately embedded third-party trackers on its website, knew that those trackers would capture visitors' IP addresses and device metadata, and used the resulting data in concert with [the Third Parties] to facilitate targeted advertising." *Fregosa*, 2025 WL 2886399, at *8. And Harris and other users were thus harmed by Defendant's installation and usage of the Trackers. *Deivaprakash*, 2025 WL 2541952, at *4 ("Condé ignores, however, that, as alleged by Deivaprakash, it enabled the third parties to amass information about Deivaprakash by embedding the code in its websites that surreptitiously installed the trackers on Deivaprakash's browser in the first place.").

In short, the allegations regarding what information the Trackers collect and how are sufficient in and of themselves to render the Trackers "pen registers." But the allegations related to profiling linking and real-time bidding are relevant to Defendant's use of the Trackers and Harris's injury. All these allegations are appropriately considered. *Deivaprakash*, 2025 WL 2541952, at *4; *Fregosa*, 2025 WL 2886399, at *8 ("Mashable embedded third-party trackers in its own website, thereby causing users' browsers to install and run them, and that Mashable used the resulting data

flows. On those facts, Mashable itself installed and/or used a … pen register.") (cleaned up); *Xu*, 2025 WL 3035016, at *3 ("Defendant argues that the conduct of Third Parties is not relevant to Plaintiff's claim against it. However, it appears Defendant does not account for Plaintiff's allegation that it was responsible for the installation of the Trackers.") (cleaned up); *McClung*, 2024 WL 189006, at *2 n.1 ("The whole idea of AddShoppers' scheme is to tie browsing activity on one site with personal information disclosed on another site, obviating the need for the retailers to do it themselves."). This is especially so because the consequences of Defendant's conduct are not "downstream." Instead, the conduct occurred on the Website, where Harris was linked to profiles and had his information sold to and bid on by advertisers. *See*, *e.g.*, Compl. ¶¶ 71, 77, 88, 109-110, 126, 128, 209, 217.

## V. HARRIS HAS STATUTORY STANDING UNDER THE CIPA

Defendant argues Harris "lacks statutory standing to assert a Section 637.2 claim in any court" because he has not shown "his privacy was invaded." Mtn. at 24:2-9. For the same reasons as Harris's allegations suffice for Article III standing, they also suffice for statutory standing under the CIPA. *See* Argument §§ III.A-III.B, *supra*. But to be clear, CIPA § 637.2 imposes a much lower burden than Article III standing. *Carolus*, 2025 WL 1338193, at *1. It allows "[a]ny person who has been injured by a violation of this chapter"—privacy-related or otherwise— to "bring an action against the person who committed the violation," but "[i]t is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." Cal. Pen. Code §§ 637.2(a), (c). Thus, so long as Harris has alleged a viable CIPA claim (and he has), this suffices for statutory standing and permits him to seek relief. *See Ribas v. Clark*, 38 Cal. 3d 355, 365 (1985) ("[P]laintiff asserts a violation of the Privacy Act … Section 637.2 therefore permits him to pursue his statutory remedy of a civil lawsuit for $3,000 [now $5,000], even though the judicial privilege bars his recovery for the only actual damage he claims to have suffered.").

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion. If the Court grants the Motion in any respect, Harris respectfully requests leave to amend. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017).

Dated: November 5, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Kaili C. Lynn*
Kaili C. Lynn

L. Timothy Fisher (State Bar No. 191626)
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
klynn@bursor.com
jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty (*pro hac vice forthcoming*)
Carol Villegas (*pro hac vice forthcoming*)
Jonathan D. Waisnor (State Bar No. 345801)
James M. Fee (*pro hac vice forthcoming*)
Danielle Izzo (*pro hac vice forthcoming*)
140 Broadway New York, NY 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477

*Attorneys for Plaintiff*