Sheri Pan (SBN 316136)
sheri@zwillgen.com
ZWILLGEN LAW LLP
369 Pine Street, Suite 506
San Francisco, CA 94104
Telephone: (415) 590-2335
Facsimile: (415) 636-5965

*Attorneys for Defendant*
*iHeartMedia, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TREVOR HARRIS, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IHEARTMEDIA, INC.,<br><br>Defendant. | Case No.: 5:25-cv-06038-EKL<br><br>**DEFENDANT IHEARTMEDIA, INC.'S REPLY IN SUPPORT OF ITS MOTION TO TRANSFER, COMPEL ARBITRATION, OR DISMISS THE CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Eumi K. Lee<br>Hearing Date: December 17, 2025<br>Time: 10:00 a.m.<br>Courtroom: 7, 4th Floor |

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. ARGUMENT ..... 1

A. The Undisputed Evidence Shows that Plaintiff Assented to iHeart's Terms. ..... 1

1. Plaintiff was on inquiry notice of the 2024 Terms. ..... 2

2. Plaintiff's "click" manifested assent to the 2024 Terms. ..... 5

3. Transfer may be necessary after development of a factual record ..... 6

B. Plaintiff Lacks Article III Standing. ..... 7

1. Plaintiff cannot distinguish his claim from *Popa* and its progeny. ..... 7

2. Allegations of unjust enrichment do not independently establish standing. ..... 10

C. Plaintiff Cannot Demonstrate Use of a "Pen Register." ..... 10

D. Plaintiff Lacks Statutory Standing. ..... 15

III. CONCLUSION ..... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aviles v. Hitachi Vantara LLC*,
No. 24STCV19162 (Super. Ct. Los Angeles Cnty. Aug. 28, 2025) ........................................ 12

*Aviles v. LiveRamp, Inc.*,
No. 24STCV19869, 2025 WL 487196 (Super. Ct. Los Angeles Cnty. Jan. 28, 2025) ........................................ 12

*Berman v. Freedom Financial Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ........................................ 2-3, 4, 6

*Bradshaw v. Lowe's Companies, Inc.*,
No. 25CV0742 DMS (MMP), 2025 WL 3171740 (S.D. Cal. Nov. 12, 2025) ........................................ 8

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) ........................................ 5

*Corley v. United States*,
556 U.S. 303 (2009) ........................................ 11

*Cruz v. Tapestry, Inc.*,
113 Cal. App. 5th 943 (2025) ........................................ 4

*Deivaprakash v. Conde Nast Digit.*,
No. 25-CV-04021-RFL, 2025 WL 2541952 (N.D. Cal. Sept. 4, 2025) ........................................ 7

*Deivaprakash v. Conde Nast Digit.*,
No. 25-CV-04021-RFL, 2025 WL 2779193 (N.D. Cal. Sept. 30, 2025) ........................................ 7, 8

*DellaSala v. Samba TV, Inc.*,
No. 3:25-CV-03470-JSC, 2025 WL 3034069 (N.D. Cal. Oct. 30, 2025) ........................................ 7

*Doe v. Eating Recovery Ctr. LLC*,
No. 23-CV-05561-VC, 2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) ........................................ 14

*Edwards v. MUBI, Inc.*,
773 F. Supp. 3d 868 (N.D. Cal. 2025) (Lee, J.) ........................................ 4

*Fregosa v. Mashable, Inc.*,
No. 25-cv-01094-CRB, 2025 WL 2886399 (N.D. Cal. Oct. 9, 2025) ........................................ 13

*Gabrielli v. Motorola Mobility LLC*,
No. 24-cv-09533-JST, 2025 WL 1939957 (N.D. Cal. July 14, 2025) ........................................ 7

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) ........................................ 4, 5

*Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025) ........................................................................................2, 3

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023)...............................................................................10, 11

*In re Facebook, Inc. Internet Tracking Litigation*,
956 F.3d 589 (9th Cir. 2020) ..........................................................................................8, 10

*In re Google RTB Consumer Priv. Litig.*,
606 F. Supp. 3d 935 (N.D. Cal. 2022)..................................................................................10

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023)....................................................................................7

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) ........................................................................................ 4-5

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025)................................................................................10

*Khamooshi v. Politico LLC*,
No. 24-cv-07836 (N.D. Cal. June 3, 2025), ECF No. 49 ........................................................9

*Khamooshi v. Politico LLC*,
No. 24-cv-07836-SK, 2025 WL 2822879 (N.D. Cal. Oct. 2, 2025)..................................9, 10

*Kishnani v. Royal Caribbean Cruises Ltd.*,
No. 25-cv-01473-NW, 2025 WL 1745726 (N.D. Cal. June 24, 2025) ....................................9

*Kroskey v. Elevate Labs, LLC*,
No. 5:24-CV-08113-EJD, 2025 WL 1507091 (N.D. Cal. May 27, 2025) ........................3, 4, 6

*L. W. A. v. LinkedIn Corp.*,
No. 5:24-CV-08436-EJD, 2025 WL 2780788 (N.D. Cal. Sept. 30, 2025)........................3, 4, 6

*Lee v. Plex, Inc.*,
773 F. Supp. 3d 755 (N.D. Cal. 2025) (Lee, J.)...................................................................4, 6

*Mitchener v. CuriosityStream, Inc.*,
No. 25-CV-01471-NW, 2025 WL 2272413 (N.D. Cal. Aug. 6, 2025) ....................................9

*Patrick v. Running Warehouse, LLC*,
No. 2:21-CV-09978-ODW, 2022 WL 10584136 (C.D. Cal. Oct. 18, 2022) ............................3

*Pizarro v. QuinStreet, Inc.*,
No. 22-CV-02803-MMC, 2022 WL 3357838 (N.D. Cal. Aug. 15, 2022)................................3

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ........................................................................................7, 8

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) .......... 7, 10

*Rocha v. Urban Outfitters, Inc.*,
No. 23-CV-00542-AMO, 2024 WL 393486 (N.D. Cal. Feb. 1, 2024) .......... 4

*Rodriguez v. Culligan Int'l Co.*,
No. 25-CV-00225-AJB-KSC, 2025 WL 3064113 (S.D. Cal. Nov. 3, 2025) .......... 8

*Rushing v. Williams-Sonoma, Inc.*,
No. 16-CV-01421-WHO, 2025 WL 2391394 (N.D. Cal. Aug. 18, 2025) .......... 2

*Russell v. Walmart Inc.*,
655 F. Supp. 3d 937 (N.D. Cal. 2023) .......... 14

*Sanchez v. Cars.com, Inc.*,
No. 24STCV13201, 2025 WL 487194 (Cal. Super. Ct. Jan. 27, 2025) .......... 15

*Sarhadi v. Pear Health Labs, Inc.*,
No. 24-CV-07921-TLT, 2025 WL 1350033 (N.D. Cal. Apr. 18, 2025) .......... 2

*Selby v. Sovrn Holdings, Inc.*,
No. 25-CV-03139-RFL, 2025 WL 2950164 (N.D. Cal. Oct. 17, 2025) .......... 7

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) .......... 3

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) .......... 11

*In re U.S. for Ords. (1) Authorizing Use of Pen Regs. & Trap & Trace Devices*,
515 F. Supp. 2d 325 (E.D.N.Y. 2007) .......... 12

*United States v. Wei Lin*,
738 F.3d 1082 (9th Cir. 2013) .......... 11

*Xu v. Reuters News & Media Inc.*,
24 Civ. 2466 (PAE), 2025 WL 488501 (S.D.N.Y. Feb. 13, 2025) .......... 8

*Xu v. Reuters News & Media, Inc.*,
No. 24-cv-2466, ECF No. 1 .......... 9

**Statutes**

18 U.S.C. § 3127 .......... 12

Cal. Penal Code § 637.2 .......... 15

Cal. Penal Code § 638.50 .......... 11, 12

Cal. Penal Code § 638.51 ........ 11, 12, 13, 14

Federal Pen Register Act ........ 12

**Other Authorities**

U.S. Const. art. III ........ 7, 15

# I. INTRODUCTION

Just as Plaintiff attempted to dress up the meager allegations in his Complaint (ECF No. 1) with nefarious-sounding language about how the technology with which he takes issue can be used for "tracking" users across the Internet, he now seeks to pad his Opposition to defendant iHeartMedia, Inc.'s ("iHeart") Motion to Transfer, Compel Arbitration, or Dismiss (ECF No. 20) with authority that is outdated, inapt, and unpersuasive. When assessed under the appropriate legal standards, however, this case should be compelled to arbitration or dismissed on the merits.

In terms of arbitration, Plaintiff's overly-parsed assessment of iHeart's account creation page does not assess the page as a whole, as caselaw requires, and, in turn, cannot overcome that a reasonably prudent user of iHeart's website would understand that (i) the 2024 Terms applied to the creation of an iHeart account and (ii) clicking *any* button of the account creation screen demonstrated an intent to be bound. Because Plaintiff does not contest the information submitted with iHeart's motion, this matter must be sent to arbitration.

In terms of Article III standing, Plaintiff's efforts to distinguish his claim from myriad similar cases in which the Ninth Circuit and numerous district courts have found that plaintiffs lack standing based on the collection of their IP addresses and similar data are unavailing.

In terms of Plaintiff's failure to state a claim under Section 638.51, Plaintiff does not plausibly allege that iHeart allowed the use of any technology on its website that constitutes a "pen register" as defined by California law. Plaintiff's reading of "pen register" is so untenably broad that it exceeds even the atextual boundaries he attempts to impose. Nor does Plaintiff show he suffered an injury sufficient to satisfy Section 637.2's statutory standing requirement.

Plaintiff's case should be compelled to arbitration or dismissed.

# II. ARGUMENT

## A. The Undisputed Evidence Shows that Plaintiff Assented to iHeart's Terms.

While not disclosed in his original Complaint, Plaintiff does not dispute that he created an iHeart account on December 1, 2024. Nor does he dispute any evidence iHeart submitted in connection with its motion to transfer or compel arbitration. Instead, Plaintiff effectively posits that

*no* terms governed his iHeart account. Plaintiff is wrong and this case must, at least, be sent to arbitration.

**1. Plaintiff was on inquiry notice of the 2024 Terms.**

An honest review of iHeart's account creation page demonstrates that Plaintiff was on notice of the 2024 Terms. For sign-in wrap cases like this one, the question of constructive notice turns on two issues: "the context of the transaction and the placement of the notice." *Sarhadi v. Pear Health Labs, Inc.*, No. 24-CV-07921-TLT, 2025 WL 1350033, at *5 (N.D. Cal. Apr. 18, 2025) (citation omitted). Plaintiff contends neither element supports iHeart's position here. He—and his overly dissected evaluative approach—is wrong.

***First***, and in terms of the placement and presentation of iHeart's notice text, Plaintiff breaks iHeart's account creation page down into its component parts (e.g., font size, color, placement, etc.) and then argues for a finding of inconspicuousness using soundbites from different decisions discussing issues like "tiny font[s]," "advisal text [that] blends into the background," or the placement of hyperlinked terms "far below" relevant action buttons. (Opp. at 4 (citations omitted).) But this "checklist" approach to conspicuousness has been expressly rejected by the Ninth Circuit. *Godun v. JustAnswer LLC*, 135 F.4th 699, 710 (9th Cir. 2025) (explaining that neither the court nor California law has "created a checklist for website designers" or "generated per se design rules that must be followed for a contract to be formed between a website user and provider"). Rather, and as Plaintiff's own cases explain, the Court's job is not to evaluate iHeart's notice piece-by-piece, but to determine "how the visual elements [on the account creation page] work together." *Rushing v. Williams-Sonoma, Inc.*, No. 16-CV-01421-WHO, 2025 WL 2391394, at *3 (N.D. Cal. Aug. 18, 2025), *appeal filed*, No. 25-5252 (9th Cir. Aug. 19, 2025). This is a "totality-of-the-circumstances" test that is "tuned to the expectations of a reasonably prudent internet user." *Godun*, 135 F.4th at 710.

When assessed in this context—and with "a hefty dose of common sense," *id.*—Plaintiff's piecemeal criticisms fall apart. Take the issues of font size and color. In terms of size, it is true that iHeart's notice text is *slightly* smaller than some other textual elements on the page. But it is nothing like the notice text in *Berman v. Freedom Financial Network, LLC*, Plaintiff's leading case, which

the Ninth Circuit described as printed "in a font so small that it is barely legible to the naked eye." 30 F.4th 849, 856–57 (9th Cir. 2022); *see also* Exhibit A (notices at issue in *Berman*). Here, Plaintiff does not (and could not) argue that iHeart's text is "barely legible"; rather, it is only slightly smaller than some (but not all) other text on the page and is more than "legible to the naked eye." *Patrick v. Running Warehouse, LLC,* No. 2:21-CV-09978-ODW (JEMX), 2022 WL 10584136, at *5 (C.D. Cal. Oct. 18, 2022), *aff'd*, 93 F.4th 468 (9th Cir. 2024) (quoting *Berman*, 30 F.4th at 856-57). Same with respect to font color. Courts, including those identified by Plaintiff, have found that where notice text is presented in a color similar to a webpage's background and lighter than other text on the page, it may be "hard to read" and, thus, less conspicuous. *Godun*, 135 F.4th at 711; *see also Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 481 (2021) (criticizing notice text's color that is "smaller print than any other print on the page and in a grey shade that contrasts . . . significantly less than other text on the page"). But here, the notice pointing to iHeart's 2024 Terms is the *same* color as almost all the other text appearing on the page, all of which contrasts against the *same* white background. This consistent color scheme also makes the underlined hyperlinked text—which also uses capitalized first letters and is darker than the surrounding plain text—stand out as a clickable link, such that "a user would not 'be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to ferret out hyperlinks.'" *Pizarro v. QuinStreet, Inc.*, No. 22-CV-02803-MMC, 2022 WL 3357838, at *3 (N.D. Cal. Aug. 15, 2022) (citation omitted); *see also L. W. A. v. LinkedIn Corp.*, No. 5:24-CV-08436-EJD, 2025 WL 2780788, at *3 (N.D. Cal. Sept. 30, 2025) (underlined text sufficient to draw attention to hyperlink); *Kroskey v. Elevate Labs, LLC*, No. 5:24-CV-08113-EJD, 2025 WL 1507091, at *4 (N.D. Cal. May 27, 2025) (hyperlinks that were "bold with the first letters capitalized . . . [stood] apart from the other text in the [notice] sentence").

But most important of all—and completely unaddressed by Plaintiff—is that iHeart's account creation page is visually clean, uncluttered, lacks districting colors or other elements, and deals with a single subject: the creation of an iHeart account. Compare that to the hopelessly busy notices in Plaintiff's selected cases. The relevant screen in *Berman* was very long and used tiny notice font—sandwiched between other bits of text—that was "deemphasized by the overall design of the

webpage, in which other visual elements [such as brightly colored buttons and graphics] draw the user's attention away from the barely readable critical text." 30 F.4th at 857. The notice in *Edwards v. MUBI, Inc.* was "set against a dynamic background of rolling movie clips that change over time and district the user's attention." 773 F. Supp. 3d 868, 883 (N.D. Cal. 2025) (Lee, J.). The screen in *Rocha v. Urban Outfitters, Inc.*, included multiple, "more distracting features" that were "more likely to draw a consumer's attention." No. 23-CV-00542-AMO, 2024 WL 393486, at *4 (N.D. Cal. Feb. 1, 2024). And the screen in *Cruz v. Tapestry, Inc.* included "several other visual elements," including advertisements for different services, that distracted away from the notice text. 113 Cal. App. 5th 943, 957 (2025), *as modified* (Aug. 27, 2025). These all stand in stark contrast to the "clean and simple format of [iHeart's account creation] page," which consists of a few fillable fields and three clickable buttons. *L. W. A.*, 2025 WL 2780788, at *4. Given its overall design, a "reasonably prudent internet user would see the notice and understand that the phrase 'Terms of Use' was a hyperlink to [iHeart's] terms," even though that notice appeared some distance below the relevant action buttons. *Id.* (citing *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911 (N.D. Cal. 2024)); *see also Kroskey*, 2025 WL 1507091, at *4 (notice was conspicuous even though it was "separated by significant white space" from relevant action buttons).

***Second***, the context of Plaintiff's transaction—i.e., the creation of an iHeart account that, as the account creation screen explained, would allow Plaintiff "[t]o listen to thousands of live radio and artists stations"—would lead a reasonably prudent user to anticipate an ongoing relationship to which terms would apply. (Rowe Decl. ¶ 5 (ECF No. 19); Rowe Decl. Ex. A (ECF No. 19-1).) Citing *Lee v. Plex, Inc.*, Plaintiff argues that users signing up for any free services, which they can stop using at any time, would not anticipate an "ongoing" relationship. 773 F. Supp. 3d 755, 765 (N.D. Cal. 2025) (Lee, J.). The Ninth Circuit disagrees. In *Keebaugh*, the court addressed a group of users that assented to terms when accessing a free-to-play mobile game. *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1020 (9th Cir. 2024). Even though those users could stop using the game without consequence at any time, the court contrasted the relationship from "a typical one-and-done interaction between the user and a traditional website." *Id.* Indeed, the court implicitly suggested that the act of downloading the game to a user's phone acted as a proxy for "establish[ing] an account,"

which would "reflect an ongoing relationship" and, in turn, put users on notice that terms would likely apply. *See id.* Courts in this district have applied that reasoning to situations where, like here, a user signs up for a "continuing service" like iHeart's. *See*, *e.g.*, *Ghazizadeh*, 737 F. Supp. 3d at 925-26. Accordingly, a reasonably prudent user would have expected, and been on the lookout for, the terms that would have governed the creation of an iHeart account.

**2. Plaintiff's "click" manifested assent to the 2024 Terms.**

Plaintiff next argues that his "click" of the Google button on iHeart's account creation page did not sufficiently manifest his assent to the 2024 Terms because of a mismatch between the text of the notice ("By creating an account . . ."), on the one hand, and the buttons on the page ("Sign Up," or connect with "Facebook" or "Google"), on the other. (Opp. at 7-9.) Like his "checklist" approach to the elements of conspicuous notice, Plaintiff takes a far too narrow view of what is required to manifest assent.

As the Ninth Circuit has explained, a user unambiguously manifests assent to online terms where a webpage "explicitly advise[s]" what the act of clicking a button will do. *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1158 (9th Cir. 2025). In *Chabolla*, for example, the court explained that inputting into a fillable form asking "What's your name?" and clicking "Continue" did not manifest assent when the page's notice text stated "By signing up you agree to our Terms of Use" because there was nothing on the page explicitly connecting a user's click (i.e., after inputting only their first and last name) to the hyperlinked terms. *Id.* That does not describe the situation here. Plaintiff first clicked a hyperlink next to text stating "Don't have an account?," which brought him to iHeart's account creation page. (Rowe Decl. Ex. A (ECF No. 19-1 at 2, 3).) Unlike the page at issue in *Chabolla*, *both* the header ("To listen to thousands of live radio and artists stations, create a free account") and the notice text ("By creating an account, you also agree to our **Terms of Use** and **Privacy Policy**") of iHeart's account creation page consistently told users that, by accessing the page, they could create an account in one of two ways: by entering an email address and "signing up" or by connecting with a Facebook or Google account by clicking on the corresponding button. The header and the notice text made clear that regardless of which button a user clicked to proceed with his or her account creation, he or she must agree to iHeart's 2024 Terms. Multiple post-*Chabolla* cases have

analyzed and found unambiguous manifestations of assent for similar account creation screens. *See*, *e.g.*, *L. W. A.*, 2025 WL 2780788, at *1; *Kroskey*, 2025 WL 1507091, at *1. In *Kroskey*, for example, Judge Davila held that clicks on "Continue with Apple, Google, Facebook, or Email" buttons unambiguously manifested assent where notice language lower on the same screen stated "By creating your account, you agree to Balance's **Terms and Conditions** and **Privacy Policy**." 2025 WL 1507091, at *4 (holding that the notice "explicitly advised that the act of clicking will constitute assent to the terms") (quoting *Berman*, 30 F.4th at 857). This corresponds almost exactly with the language used in buttons and notice text on iHeart's account creation page: users click on buttons prompting them to "Connect With" either "Facebook" or "Google," and notice language lower on the same screen informs them that "By creating an account, you also agree to the <u>Terms of Use</u> and <u>Privacy Policy</u>." (Rowe Decl. ¶ 6 (ECF No. 19); Rowe Decl. Ex. A at 2 (ECF No. 19-1).) *Lee*, cited by Plaintiff, is not inconsistent with this because the notice in that case "describe[d] two actions that constitute assent," which was difficult to reconcile with user interactions and expectations with respect to the relevant webpage. *Lee*, 773 F. Supp. 3d at 767. Here, as in *L. W. A.* and *Kroskey*, iHeart's account creation screen and notice text introduces no ambiguity but, instead, explicitly informs users that no matter what option they choose, they are visiting the page to do one thing: "create an account." Plaintiff's click therefore manifested assent to iHeart's hyperlinked 2024 Terms.

**3. Transfer may be necessary after development of a factual record.**

Finally, Plaintiff argues that transfer is not appropriate because iHeart did not put forward evidence that Plaintiff had actual notice of the 2025 Terms when he accessed the website in April 2025. (Opp. at 9.) Factually, Plaintiff accurately states the record: iHeart has submitted uncontested evidence that Plaintiff used the website after the 2025 Terms were posted but presently lacks evidence that Plaintiff knew about the terms update at that time. Because Plaintiff has not yet acknowledged he was aware of updated terms when he accessed the site, iHeart agrees that arbitration pursuant to the 2024 Terms is the appropriate result. But to the extent the Court does not order arbitration, iHeart reserves all rights to seek transfer upon development of a factual record showing Plaintiff had notice of the 2025 Terms.

**B. Plaintiff Lacks Article III Standing.**

Plaintiff's efforts to demonstrate that he suffered a "concrete" injury sufficient to establish Article III standing are similarly unavailing.

**1. Plaintiff cannot distinguish his claim from *Popa* and its progeny.**

As iHeart explained, the Ninth Circuit's recent *Popa v. Microsoft Corp.* decision makes clear that third-party vendors' receipt of a website visitor's information during the course of a website visit does not generally demonstrate a "concrete" injury sufficient to establish Article III standing. *See generally* 153 F.4th 784 (9th Cir. 2025). While Plaintiff attempts to shrug the decision off as nothing new, the authorities he relies on in attempting to distinguish his claim from the injury alleged in *Popa* predate that precedential decision, do not address *Popa*, or do not address Article III standing challenges. *See DellaSala v. Samba TV, Inc.*, No. 3:25-CV-03470-JSC, 2025 WL 3034069, at *2 (N.D. Cal. Oct. 30, 2025) (declining to address *Popa* and injury-in-fact requirement because defendant did not raise the issue until reply brief); *Selby v. Sovrn Holdings, Inc.*, No. 25-CV-03139-RFL, 2025 WL 2950164 (N.D. Cal. Oct. 17, 2025) (no Article III standing challenge); *Deivaprakash v. Conde Nast Digit.*, No. 25-CV-04021-RFL, 2025 WL 2779193, at *1 (N.D. Cal. Sept. 30, 2025) (discussing challenge to statutory standing, not Article III standing); *Deivaprakash v. Conde Nast Digit.*, No. 25-CV-04021-RFL, 2025 WL 2541952, at *4 (N.D. Cal. Sept. 4, 2025) (same); *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075 (N.D. Cal. 2025) (decision predated *Popa* and involved no standing challenge whatsoever); *Gabrielli v. Motorola Mobility LLC*, No. 24-cv-09533-JST, 2025 WL 1939957 (N.D. Cal. July 14, 2025) (decision predated *Popa*); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (same). *Popa* did not re-write Article III jurisprudence, but the decision made clear that allegations like the ones alleged here do not have a reference point in any traditional privacy tort and, thus, do not implicate Article III.

Plaintiff suggests the difference between this case and *Popa* is the downstream "linkage of [collected] information" to "profiles maintained by data brokers." (Opp. at 16.) While the Opposition identifies one post-*Popa* decision seemingly supporting this view—*Deivaprakash v. Conde Nast Digital*, which suggested that the mere "compilation" of information about a plaintiff might give rise to an Article III injury, 2025 WL 2779193, at *1—that decision relies on a misinterpretation of *Popa*

and *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020). Indeed, and as the decision in *Bradshaw v. Lowe's Companies, Inc.* recently identified, the difference between these cases and *In re Facebook*, is that *In re Facebook's* "compiled" sensitive information was in fact *collected* by Facebook itself after Facebook users had logged off the social media platform. No. 25CV0742 DMS (MMP), 2025 WL 3171740, at *6 (S.D. Cal. Nov. 12, 2025). This unexpected direct *collection* of sensitive information by the defendant was critical to the Ninth Circuit's conclusion that the plaintiffs had alleged an actionable invasion of their privacy interests. 956 F.3d at 598; *accord Popa*, 153 F.4th at 794. Thus, for *In re Facebook*, the reason that the "compilation" of private information "constituted sufficient allegations of injury"—i.e., the only point emphasized in *Deivaprakash*, 2025 WL 2779193, at *1—was because it was Facebook that *collected* the sensitive information to begin with.

Here, by contrast, Plaintiff alleges only the collection of his IP address and "Device Metadata" when he visited the iHeart website. (Compl. ¶ 2.) Because there is no privacy interest in the kind of data collected by iHeart's alleged violation of Section 638.51(a)—particularly where, as here, it is received via normal, everyday website interactions—there is no Article III injury. *Bradshaw*, 2025 WL 3171740, at *6 ("These are significant differences that result in fundamentally different harms and take this case outside the holding of *Facebook.*"); *accord Rodriguez v. Culligan Int'l Co.*, No. 25-CV-00225-AJB-KSC, 2025 WL 3064113, at *3 (S.D. Cal. Nov. 3, 2025) (defendant's alleged collection of IP address and other data did not constitute an Article III injury, despite allegations that the plaintiff was denied her "right to control the dissemination of [her] IP address ***and the other data linked to her IP address*** captured by third party spyware vendors") (emphasis and alteration in original).

For similar reasons, Plaintiff cannot distinguish this case from *Xu v. Reuters News & Media Inc.*, 24 Civ. 2466 (PAE), 2025 WL 488501 (S.D.N.Y. Feb. 13, 2025). Plaintiff says this case is different because, in *Xu*, the plaintiff "only [alleged] the collection [of] IP addresses," rather than the "downstream" matching of that information with other consumer data. (Opp. at 17 (citing *Xu*, 2025 WL 488501, at *5).) At the outset, the presence or absence of downstream data use is irrelevant where Plaintiff's claim is about the information that iHeart allegedly collects and whether that

collection gives rise to an Article III injury. But Plaintiff is also wrong: both this case and *Xu* allege the collection of the same information (e.g., IP addresses) and the use of that information, in connection with third party resources, to "target" specific users with advertisements. *Compare* Compl. ¶ 205 *with* Complaint, *Xu v. Reuters News & Media, Inc.*, No. 24-cv-2466, ECF No. 1 ¶ 69 (S.D.N.Y. Apr. 1, 2024) ("This is why Sharethrough collects IP addresses: it allows Sharethrough to ascertain a user's identity and target that user with personalized advertisements, as well as to track a user's Website activity over time (i.e., through repeated Website visits) to target a user with advertisements relevant to the user's personal browsing activity."). The complaints here and in *Xu* fail to allege a concrete injury for the same reason: the simple collection of IP address and related information does not state an Article III injury, even if that information is later used to "identify" and serve targeted advertising on specific individuals.

Plaintiff similarly attempts to distinguish this case from *Kishnani v. Royal Caribbean Cruises Ltd.*, No. 25-cv-01473-NW, 2025 WL 1745726 (N.D. Cal. June 24, 2025), *appeal dismissed*, No. 25-4452 (9th Cir. Oct. 3, 2025), and *Mitchener v. CuriosityStream, Inc.*, No. 25-CV-01471-NW, 2025 WL 2272413 (N.D. Cal. Aug. 6, 2025), *appeal dismissed*, No. 25-4990, 2025 WL 3191910 (9th Cir. Oct. 23, 2025), on the grounds that those cases did not involve "the creation of a detailed profile," or plaintiff's "reduced capacity to remain anonymous." (Opp. at 17.) But in fact, the plaintiffs in both cases effectively alleged the creation of "detailed profiles," as both alleged that the third-party software at issue "collects as much data as it can and matches it with existing data that TikTok has acquired" about the defendants' respective website visitors—i.e., the same allegations at issue here. *Kishnani*, 2025 WL 1745726, at *3 (cleaned up); *Mitchener*, 2025 WL 2272413, at *4. Same with *Khamooshi v. Politico LLC*, No. 24-cv-07836-SK, 2025 WL 2822879 (N.D. Cal. Oct. 2, 2025): in that case, the operative complaint alleged that the complained-of "tracking" software "facilitates cross-platform behavioral profiling," thus "reduc[ing] the user's 'overall anonymity on the Web.'" First Amended Complaint ¶ 101, *Khamooshi v. Politico LLC*, No. 24-cv-07836 (N.D. Cal. June 3, 2025), ECF No. 49. All these cases made the same general allegations but failed to plead an Article III injury for the same reasons that Plaintiff fails to plead one here.

**2. Allegations of unjust enrichment do not independently establish standing.**

Plaintiff also cannot create standing through an unjust enrichment theory. Plaintiff argues that because iHeart, through the alleged Trackers, used his collected IP address and device information in a way that increased the amount advertisers paid to show ads on the Website, Plaintiff has alleged an Article III injury on an unjust enrichment theory. (Opp. at 15.) But as the court in *Khamooshi* explained when rejecting the same argument, Plaintiff fails to "plausibly allege that Defendant's disclosure of [his] IP address[] was unjust." *Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1183 (N.D. Cal. 2025). Once again, *In re Facebook* provides the counterexample. In that case, the plaintiffs' "unjust profits" allegations stemmed from the information that *Facebook itself* collected from them, wherein the Ninth Circuit held that the Plaintiffs were entitled to "profits unjustly earned" from the sale of that information. *In re Facebook*, 956 F.3d at 601. The same principle supported the decisions in Plaintiffs' two standing cases, where each defendant was similarly alleged to have sold the private information it collected from the plaintiffs. *Greenley v. Kochava, Inc.,* 684 F. Supp. 3d 1024, 1038 (S.D. Cal. 2023) (standing based on disgorgement of profits relating to defendant's sale of information it collected from the plaintiff); *In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 942 (N.D. Cal. 2022) (standing based on Google's collection and sale of information about plaintiffs' individual online activity and communications). The citation to *Riganian v. LiveRamp Holdings, Inc.* discusses the merits of an unjust enrichment claim (not standing), but follows the same principle. 791 F. Supp. 3d 1075, 1095 (N.D. Cal. 2025) (upholding claim for unjust enrichment based on allegations that the defendant sold access to information that it collected information from the plaintiffs). Here, as in *Khamooshi*, Plaintiff identified nothing "unjust" about iHeart's use of any collected IP address or device information and, thus, "cannot establish an economic injury based on unjust enrichment." 786 F. Supp. 3d at 1183.

**C. Plaintiff Cannot Demonstrate Use of a "Pen Register."**

Even if Plaintiff had standing, the Opposition does not overcome the Complaint's failure to allege the use of something that would constitute a "pen register." Plaintiff attempts to support his Section 638.51 pen register theory through muddy statutory analysis that has little bearing on the statutory text. And he attempts to avoid the absurd results of his interpretative approach through

argumentative sleight of hand. The Court should stick to the statutory text and not check its common sense at the door.

Let's return to the statutory text. Section 638.51(a) prohibits the installation or use of "a pen register or a trap and trace device" without a court order. Cal. Penal Code § 638.51(a). The law's definitional section provides different definitions for both pen registers and trap and trace devices:

> (b) "Pen register" means a device or process that records or decodes dialing, routing, addressing, or signaling information ["DRAS"] transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication.
>
> (c) "Trap and trace device" means a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication.

Cal. Penal Code § 638.50. Plaintiff's statutory argument—derived from the decision in *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024)—is limited to the definition of "pen register" in Section 638.50(b). Per *Shah*, because that statutory definition includes "expansive language" that does not limit its "recording or decoding" to "recipient" DRAS information, *id.* at 929 (quoting *Greenley*, 684 F. Supp. 3d at 1050), Plaintiff argues that as long as the device or process in question captures *any* transmitted DRAS information, it is a pen register. (Opp. at 19.) But on that interpretation, every trap and trace device—which also captures transmitted DRAS information—must also be a pen register. *Shah*'s interpretation—and Plaintiff's along with it—therefore violates the axiomatic rule that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States,* 556 U.S. 303, 314 (2009) (internal quotation marks and alterations omitted); *see also United States v. Wei Lin,* 738 F.3d 1082, 1084 (9th Cir. 2013) (rejecting an interpretation of one statutory provision that "would leave no work to be done by" another).

The better and more commonsense interpretation—which gives separate meaning to both Sections 638.50(b) and (c), the "or" in Section 638.51(a), and does not rely on "policy-based arguments" as Plaintiff claims (*see* Opp. at 22)—is the one recognizing that, as courts have held for years, pen registers and trap and trace devices either identify "outgoing" or "incoming" DRAS

information, respectively, as discussed in the Motion. This is consistent with Section 638.50(b)'s use of the word "transmitted" (i.e., referencing outgoing DRAS information) and Section 638.50(c)'s use of the word "incoming" (i.e., referencing incoming DRAS information). Indeed, and contrary to Plaintiff's suggestion, courts have adhered to this interpretation even for the post-2001 version of the Federal Pen Register Act, which mirrors the language in Section 638.50(b) and still maintains the mirror-image relationship between pen registers, on the one hand, and trap and trace devices, on the other. *In re U.S. for Ords. (1) Authorizing Use of Pen Regs. & Trap & Trace Devices*, 515 F. Supp. 2d 325, 328 n.2 (E.D.N.Y. 2007) (discussing post 2001 version of Federal Pen Register Act, and noting that "[a] trap and trace device functions much like a pen register, but it records information passing in the opposite direction. That is, a trap and trace device shows what numbers call a specific telephone, i.e. all incoming phone numbers. A pen register, on the other hand, shows what digits a phone has dialed, i.e. all outgoing phone numbers."); *compare* 18 U.S.C. § 3127(3) *with* Cal. Penal Code § 638.50(b). This interpretation is also consistent with the California decisions interpreting Section 638.51, including *Aviles v. LiveRamp, Inc.*, No. 24STCV19869, 2025 WL 487196, at *2 (Super. Ct. Los Angeles Cnty. Jan. 28, 2025), *adopted*, No. 24STCV19869, 2025 WL 487199 (Super. Ct. Los Angeles Cnty. Jan. 28, 2025), and Minute Order at 1, *Aviles v. Hitachi Vantara LLC*, No. 24STCV19162, (Super. Ct. Los Angeles Cnty. Aug. 28, 2025).

Notably, this interpretation results in none of the absurd consequences flowing from Plaintiff's proposed treatment of the statute: as long as a website operator does not install a "device or process" on its visitors' browsers that track all of the *other* websites they visit (i.e., the outgoing DRAS information from their device, which would be a pen register), it can continue to receive the IP addresses of its visitors without having to choose between obtaining a court order and incurring ruinous civil or criminal liability. But if Plaintiff's interpretation is followed, *every* website that collects its visitors' IP addresses is liable for unlawful "tracking" because each receives the outgoing DRAS transmissions from every visitor's browser. Plaintiff writes these concerns off as "laughably wrong," but the solutions he offers go nowhere.

***First***, Plaintiff suggests that the mere receipt of DRAS information like email addresses or IP addresses is "worlds' apart" from "the creation of detailed profiles sold to advertisers." (Opp. at 21.)

Maybe, but Section 638.51 has nothing to do with how data collected by a pen register or trap and trace device is used; the statute only addresses the installation or use of pen registers or trap and trace devices to capture the DRAS information in the first instance.

To this end, Plaintiff's lengthy discussion that iHeart "misses the point" by arguing that any downstream use of Plaintiff's data has no bearing on whether the initial receipt of such data constituted use of a pen register is exactly backwards. (Opp. at 24.) Plaintiff argues that downstream use of his data goes to the question of whether he was harmed by the alleged data collection, and thus whether he has standing to pursue his claim, not whether the Trackers themselves constitute pen registers. (*Id.* at 24–25.) But this argument is directly contradicted by Plaintiff's repeated assertions that the manner in which his data was used bear on whether the data collection itself constituted use of a pen register. For example, he argues that "[Harris] does not allege that [Defendant] violated CIPA simply by receiving IP addresses as part of an ordinary online exchange. Rather, the [Complaint] alleges that [Defendant] affirmatively embedded *third-party trackers* that recorded and transmitted users' identifying information *to outside entities* **for profiling and advertising purposes**." (*Id.* at 22 (quoting *Fregosa v. Mashable, Inc.*, No. 25-cv-01094-CRB, 2025 WL 2886399, at *7 (N.D. Cal. Oct. 9, 2025) (brackets and italics emphasis in Plaintiff's original, bold emphasis added).) And Plaintiff compares the use of Trackers on iHeart's website to having an email sender's email address "secretly routed to a third party without consent (**who then linked that e-mail address to a profile with comprehensive information and sold that profile to advertisers to enrich the other party to the communication**)." (*Id.* at 21 (emphasis added).) Plaintiff's repeated emphasis on the way in which his IP address or device information was *used* reflects an attempt to define "pen register" based precisely on such downstream applications. As Plaintiff himself seems to acknowledge, that is irrelevant to the question of whether or not iHeart violated Section 638.51.

***Second***, Plaintiff argues that party-to-party communications are exempt under the consent exception, which would cover communications like emails or, more relevant here, requests for website content. (Opp. at 21.) And that therefore "all Defendant must do to comply with the CIPA is to procure its users' prior consent." (*Id.* at 23.) That statement is both incorrect and further demonstrates why third-party software like that at issue here cannot be a pen register. The consent

exception only applies to the use of pen registers or trap and trace devices by "[a] provider of electronic or wire communication service." Cal. Penal Code § 638.51(b)(5). Thus, to the extent a website is not such a provider (here, neither Plaintiff nor iHeart argue that iHeart is a provider of an electronic or wire communication service), it cannot avail itself of the "consent" exception. Thus, every website not providing electronic or wire communication services (i.e. the vast majority of websites) must "secure a criminal court order just to operate, or else expose itself to civil and criminal liability." (Mot. at 20 (citing Cal. Penal Code § 638.51(c).). No consent—whether, prior, written, or contractual—would suffice if the statute is construed as Plaintiff suggests. Such an absurd result should be avoided. *Russell v. Walmart Inc.*, 655 F. Supp. 3d 937, 941 (N.D. Cal. 2023) ("Court[s] avoid absurd results when interpreting statutes.") (cleaned up); *see also Doe v. Eating Recovery Ctr. LLC*, No. 23-CV-05561-VC, 2025 WL 2971090, at *1 (N.D. Cal. Oct. 17, 2025) (advising that "courts should generally resolve CIPA's many ambiguities in favor of the narrower interpretation" including because it is a criminal statute to which the rule of lenity applies "even when the statute is being invoked in a civil action").

***Third***, Plaintiff suggests that liability only attaches here because iHeart uses third party cookies to collect DRAS information, rather than collecting that information itself. (Opp. at 21.) But Plaintiff identifies no rationale whatsoever for this distinction. Indeed, under Plaintiff's interpretation of Section 638.51, a website operator violates the statute anytime he or she uses a "device or process" to collect DRAS information sent by visitors' browsers regardless of whether the information is collected directly (e.g., through a normal request for website content), by using first party cookies (e.g., to keep a user logged into a website), or through third party cookies (e.g., to process payments). While Plaintiff attempts to obfuscate this point, it is an unavoidable conclusion from adopting Plaintiff's definition of a pen register: If software collects DRAS information, it "constitute[s] [a] pen register[] under CIPA." (Opp. at 1.) And while Plaintiff suggests that website visitors might consent to some of these methods of collection but not to others, the consent exception is—as discussed above—narrowly defined and not applicable on the facts alleged here.

Because Plaintiff does not allege that the Trackers collect outgoing DRAS information from his device, he cannot plausibly allege the use of a "pen register" as defined by CIPA.

**D. Plaintiff Lacks Statutory Standing.**

Plaintiff rests his statutory standing argument on his Article III analysis, but also suggests that "CIPA § 637.2 imposes a much lower burden than Article III standing" such that any CIPA violation —even a technical one without any corresponding privacy injury—is actionable. (Opp. at 25.) But as the many cases cited in the Motion explain, Plaintiff is wrong: because his case relies on the collection of information in which he "has no reasonable expectation of privacy," he has no recourse under Section 637.2, regardless of whether this case proceeds in federal or state court. (Mot. at 25 (quoting *Sanchez v. Cars.com, Inc.*, No. 24STCV13201, 2025 WL 487194, at *5 (Cal. Super. Ct. Jan. 27, 2025)).

## III. CONCLUSION

Plaintiff's arguments against compelled arbitration and dismissal are unavailing. This case should be compelled to arbitration pursuant to the 2024 Terms or dismissed with prejudice.

Dated: November 24, 2025

ZWILLGEN LAW LLP

By: */s/ Sheri Pan*

Sheri Pan (SBN 316136)
sheri@zwillgen.com

*Attorneys for Defendant*
*iHeartMedia, Inc.*