UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California

TREVOR HARRIS,
Plaintiff,
v.
IHEARTMEDIA, INC.,
Defendant.

Case No. 25-cv-06038-EKL

**ORDER DENYING MOTION TO COMPEL ARBITRATION AND MOTION TO TRANSFER**

Re: Dkt. No. 18

Before the Court is Defendant's motion to compel arbitration, transfer, or dismiss the complaint. ECF No. 18 ("Mot."). In this Order, the Court addresses the motion to compel arbitration and motion to transfer.[1] Based on the following reasons, both motions are DENIED.[2]

## I. MOTION TO COMPEL ARBITRATION

"[I]n deciding whether to compel arbitration, a court must determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). State contract law governs the contract formation question. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). The parties agree that the Court may apply California law to determine whether a binding contract was created.[3] *See* Mot. at 7; Opp. to Def.'s Mot. to Transfer, Compel Arb. or Dismiss at 2, ECF

[1] Although styled by the Defendant as one motion, the Defendant's motion was in fact three separate motions. The motion to dismiss will be addressed by the Court in a separate ruling.

[2] The Court assumes the parties' familiarity with the facts of the case. This Order references only those facts that are relevant to the Court's holding.

[3] The parties disagree as to whether New York or California law governs the contract formation question, but nonetheless agree that the Court can apply California law because there is no

No. 20 ("Opp."). Here, whether this action is subject to binding arbitration turns on whether Plaintiff agreed to iHeartMedia, Inc.'s ("iHeart's") 2024 Terms of Service ("Terms") by signing up for an account on iHeart's website in December 2024. As the party seeking arbitration, the burden is on iHeart to demonstrate that there was mutual assent to the agreement to arbitrate. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023).

"In California, internet contracts are classified 'by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps.'" *Keebaugh v. Warner Bros. Ent. Co.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463 (2021)). This case involves a sign-in wrap agreement: "[T]he website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025). Absent proof that a consumer has actual knowledge of the agreement, a sign-in wrap agreement will be enforced only if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; *and* (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856 (emphasis added); *see also Chabolla*, 129 F.4th at 1158 ("Reasonable conspicuousness alone is not sufficient to bind a user – a user must agree to the terms, not merely see them.").

The Court begins by describing the sign-in wrap agreement on iHeart's website at the time Plaintiff created his account. The Court then turns to the issue assent, finding that iHeart has failed to demonstrate that Plaintiff manifested assent to the Terms.[4]

---

substantive difference between the state laws.

[4] Because failure to demonstrate unambiguous assent is dispositive, the Court assumes without deciding that Plaintiff had inquiry notice of the 2024 Terms via the Google registration flow. *See* Figs. 3-4; *see also Chabolla*, 129 F.4th at 1158 (explaining that because the plaintiff had not manifested assent "further discussion on the conspicuousness of the notices . . . would be non-dispositive and fruitless.").

### A. iHeart's Sign-in Wrap Agreement

At the time Plaintiff created his account in 2024, an iHeart user would have encountered a few different pages when creating an account. First, the user would have seen a log in page ("Log In Page") with a hyperlink to "Sign up." Rowe Decl. Ex. A (image 1), ECF No. 19-1. After clicking the "Sign up" hyperlink, the user was then taken to a sign-up page ("Sign-Up Page"). *Id.* Ex. A (image 2). From the Sign-Up Page, the user would have created an account either by using an email address and password or by proceeding through the Facebook or Google "registration flow" pages, as described below. *Id.* Ex. A (images 3-4). These pages are depicted in Figures 1-4, included in the Appendix to this Order.

*Log In Page*: In 2024, the first page a user encountered in registering for an iHeart account was the Log In Page. *See* Fig. 1. The Log In Page had a white background with bolded black text in the top left corner that read "Log in[.]" *Id.* Below "Log in," the page read "Don't have an account? Sign up[.]" *Id.* "Sign up" was in blue font and formatted as a hyperlink to the Sign-Up Page. *Id.* Beneath this text, there were two columns separated by a vertical grey line. In the left column, the user could log in using an email address and password, and beneath the blue log in button, there were hyperlinks that read "Forgot Password?" and "Your Privacy Choices[.]" *Id.* The right column read "Or Connect With" in plain black text followed by two large buttons linking to third-party registration through Facebook and Google. *Id.* The Log In Page did not explicitly reference "Terms of Service" or "Terms of Use." *Id.*

*Sign-Up Page*: The Sign-Up Page had a white background with bolded black text in the top left corner that read "Connect with your favorites." *See* Fig. 2. Directly beneath "Connect with your favorites" in smaller, light grey font, the Sign-Up Page read: "To listen to thousands of live radio and artist stations, create a free account. Have an account? Log in[.]" *Id.* "Log in" appeared in light blue text, indicating it was a hyperlink to redirect the user to iHeart's Log In Page if the user had an existing account. *Id.* Beneath this text, there were two columns separated by a vertical grey line. In the left column, there were text-entry boxes for the user to enter an email address, password, zip code, birth year, and gender, followed by a checkbox to opt-in to email updates from iHeart. *Id.* Below the text-entry boxes and the email opt-in check box, in

smaller grey font, the Sign-Up Page stated: "By creating an account, you also agree to our Terms of Use and Privacy Policy." *Id.* The words "Your Privacy Choices" appeared directly under the preceding sentence. The phrases "Terms of Use," "Privacy Policy," and "Your Privacy Choices" appeared in underlined black font. *Id.* The "Terms of Use" text hyperlinked to iHeart's terms of service, and the "Privacy Policy" text hyperlinked to iHeart's privacy policy. *Id.* Other than underlining "Terms of Use" and "Privacy Policy," iHeart did not emphasize the hyperlinks with typical website design conventions, such as the use of bold text or a contrasting color font (*e.g.*, blue). *Berman*, 30 F.4th at 854 ("[B]lue [is] the color typically used to signify the presence of a hyperlink."). Finally, at the very bottom of the left column, there was a large blue "Sign Up" button. *See* Fig. 2.

The right column read in plain black font "Or Connect With" followed by two large, interactive buttons linking to third-party registration flows for Facebook and Google. *Id.* Each button bore the third-party application's logo and name on a white background. *Id.* There was no other text or information appearing in the right column – including no reference to the terms of use or privacy policy. *Id.* The right column did not indicate the user was "signing up" for an account, but instead indicated they were "[c]onnect[ing] [w]ith" a third-party account. *Id.* If a user clicked one of these buttons, the user was redirected to the relevant registration flow.

*Google Registration Flow*: In this case, Plaintiff clicked on the prominent "Google" button in the right column near the top of the Sign-Up Page. Opp. at 4; *see also* Rowe Decl. ¶ 7, ECF No. 19. The Google button directed Plaintiff to a second page "provided by Google – where he or she would log into or otherwise select a Google account." Rowe Decl. ¶ 6. This page appeared as a pop-out in front of the Sign-Up Page and had a white background with the Google logo at the top. *See* Fig. 3. At the very top of the pop-out window, the page read "Sign in – Google Accounts," followed by a URL for "accounts.google.com[.]" *Id.* Below the URL, the Google icon appeared immediately followed by "Sign in with Google[.]" *Id.* Beneath the Google icon, large black text instructed the user to "**Choose an account** to continue to iHeartRadio," followed by an option for the user to select the Google account they wanted to proceed with. *Id.* Beneath the account selection option, in smaller grey font, the page read: "Before using this app,

you can review iHeartRadio's privacy policy and terms of service." *Id.* "[P]rivacy policy" and "terms of service" were in blue font indicating they were hyperlinks to the referenced policy and terms. *Id.*

Once the user selected a Google account, they were redirected to another page in the Google registration flow. *See* Fig. 4. This page indicated that the user was signing into iHeartRadio via the selected Google account and stated that "Google will allow iHeartRadio to access this information about you," including name, profile picture, and email address. *Id.* In smaller black font, the page then read: "Review iHeartRadio's Privacy Policy and Terms of Service to understand how iHeartRadio will process and protect your data. [¶] To make changes at any time, go to your Google Account. [¶] Learn more about Sign in with Google." *Id.* "Privacy Policy[,]" "Terms of Service[,]" "Google Account[,]" and "Sign in with Google" were all in blue text indicating they were hyperlinks. *Id.* Finally, at the very bottom of the page in large white buttons with blue font, the user could either select "Cancel" or "Continue[.]" *Id.*

**B. Unambiguous Manifestation of Assent**

Sign-in wrap agreements do not expressly require a website user to read the terms of use before proceeding to use the website, *Chabolla*, 129 F.4th at 1154, thus assent must be manifested by another action, like clicking a button. "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. A website must use clear language to indicate what action will bind the user to the terms. *See id.* at 858 (holding that assent was lacking because the webpage "did not indicate to the user what action would constitute assent").

iHeart argues that Plaintiff "unambiguously manifested assent to the 2024 Terms by clicking the 'Google' button [on the Sign-Up Page], which was a required step in creating his iHeart account[.]" Mot. at 8. The Court disagrees. The notice on the Sign-Up Page appeared exclusively in the left column and stated that the user agrees to the "Terms of Service" and "Privacy Policy" by "creating an account." This notice was followed by a button allowing the user to "Sign Up." By contrast, the right column, which Plaintiff used to register his account,

stated that the user is "Connect[ing] With" Google or Facebook rather than "signing up" or "creating an account." Moreover, the right column made no reference to the "Terms of Use" or "Privacy Policy." Thus, the Court finds that Plaintiff clicking the Google "Connect With" button did not amount to unambiguous assent to terms that are buried in a different section of the Sign-Up Page and which related to an entirely different method of creating an account. *See Berman*, 30 F.4th at 857 ("[M]erely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything.").

Plaintiff likewise did not unambiguously manifest his assent to the 2024 Terms by proceeding through the Google registration flow. The notice on the first Google registration flow page stated: "Before using this app, you can review iHeartRadio's privacy policy and terms of service." *See* Fig. 3. The notice on the second Google registration flow page stated: "Review iHeartRadio's Privacy Policy and Terms of Service to understand how iHeartRadio will process and protect your data." *See* Fig. 4. Both notices simply instructed the user to "review" the terms of service. They did not indicate that the user was assenting to the terms of service by continuing. *See Godun v. JustAnswer LLC*, 135 F.4th 699, 712 (9th Cir. 2025) ("The advisal lacked an explanatory phrase indicating that 'By clicking connect now' or 'By connecting,' or 'By chatting,' etc., she agreed to the terms.").

In sum, a user who created an iHeart account through Facebook or Google never directly encountered the notice stating that "by creating an account" the user agrees to the terms of service and privacy policy. Even if the user did see this language, it was not clear that proceeding through the "Connect With" function on a different section of the Sign-Up Page would bind the user to iHeart's terms. In addition, when the user continued to the Google registration flow page, there was no indication that, by clicking "Continue," the user would be bound by iHeart's Terms. Therefore, iHeart has not demonstrated that Plaintiff unambiguously manifested his assent to the 2024 Terms. iHeart's motion to compel arbitration is DENIED.

## II. MOTION TO TRANSFER

In the motion to transfer, iHeart argues that the case should be transferred to the Southern District of New York pursuant to a forum selection clause in the 2025 Terms. Mot. at 5-11.

iHeart further asserts that the 2025 Terms were posted to the iHeart website on March 12, 2025, and that Plaintiff manifested his assent to the 2025 Terms by "visit[ing] the Website on April 10, 2025," and "logging in and using the [website] to access and stream media, including visiting pages that linked to the 2025 Terms." Mot. at 9. However, in its reply brief, iHeart concedes that it has not presented "evidence that Plaintiff knew about the [2025] terms update" when he visited the website in April 2025. Reply at 6, ECF No. 23. Thus, iHeart argues that the "appropriate result" is for the 2024 Terms to apply. *Id.* (stating that iHeart "reserves all rights to seek transfer upon development of a factual record showing Plaintiff had notice of the 2025 Terms."). Therefore, because the Court has found that there was no mutual assent to the 2024 Terms and iHeart concedes that it has not demonstrated assent to the 2025 Terms, its motion to transfer is DENIED.

**IT IS SO ORDERED.**

Dated: January 6, 2026

Eumi K. Lee
United States District Judge

United States District Court
Northern District of California

**APPENDIX**

**Figure 1: Log In Page (Rowe Decl. Ex. A, ECF No. 19-1 )**



**Figure 2: Sign-Up Page (Rowe Decl. Ex. A, ECF No. 19-1)**



United States District Court
Northern District of California

**Figure 3: Google Registration Flow Page 1 (Rowe Decl. Ex. A, ECF No. 19-1)**



United States District Court
Northern District of California

**Figure 4: Google Registration Flow Page 2 (Rowe Decl. Ex. A, ECF No. 19-1 )**

